# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE, )
)
)
v. ) I.D. No. 1602016732
)
AARON THOMPSON, )
)
Defendant. )

Submitted: February 8, 2022
Decided: May 31, 2022

*Upon Consideration of Defendant's Motion for Post-Conviction Relief*,
**DENIED**.

## MEMORANDUM OPINION

Maria T. Knoll, Esquire, Chief of Appeals, DEPARTMENT OF JUSTICE, Wilmington, Delaware. *Attorney for the State of Delaware*.

John P. Deckers, Esquire, LAW OFFICE OF JOHN P. DECKERS, P.A., Wilmington, Delaware. *Attorney for Defendant Aaron Thompson*.

**BUTLER, R.J.**

Defendant Aaron Thompson was convicted for his role as the hitman in a murder-for-hire scheme under which Joe and Olga Connell were shot to death outside the Paladin Club Condominiums. Thompson now moves under Rule 61 for post-conviction relief. He does not maintain his innocence. Instead, he principally claims that his lawyer at trial and on appeal ("Trial Counsel") had an actual conflict of interest that denied him his right to effective assistance of counsel. As explained below, Thompson's motion must be denied because it fails to show an actual conflict or ineffective assistance.

## BACKGROUND

The murders of Joe and Olga Connell and subsequent trials of the participants have been documented extensively.[1] The Court therefore will limit its factual recitations to those relevant to Thompson's claims.

### A. The Murder-for-Hire Scheme

Christopher Rivers and Joe Connell ran an auto repair shop together. As part of a mortgage financing, each partner was required to purchase a one-million-dollar

---

[1] *See generally State v. Rivers*, 2022 WL 964399 (Del. Super. Ct. Mar. 31, 2022); *Thompson v. State*, 205 A.3d 827 (Del. 2019); *Rivers v. State*, 183 A.3d 1240 (Del. 2018); *State v. Benson*, 2016 WL 6196073 (Del. Super. Ct. Oct. 14, 2016); *State v. Benson*, 2016 WL 3660525 (Del. Super. Ct. Apr. 27, 2016); *State v. Rivers*, 2015 WL 13697670 (Del. Super. Ct. Dec. 22, 2015); *State v. Benson*, 2015 WL 3539995 (Del. Super. Ct. June 2, 2015); *State v. Benson*, 3539358 (Del. Super. Ct. June 1, 2015). Most of these decisions involve Thompson's co-conspirators, but their basic factual background applies equally here.

2

life insurance policy on the other. Rivers was the beneficiary of Joe Connell's policy. Whether it was simple greed or more obscure motives, Rivers decided to have his partner and his new wife killed.

Joshua Bey was a customer at the auto shop. Rivers solicited Bey to kill the Connells. Bey agreed, assuring Rivers he knew people who could do that. Bey then hired Dominique Benson[2] who in turn hired Thompson to assist Benson in the hit. The three agreed to divide a $50,000 bounty payable by Rivers from Joe Connell's life insurance policy.[3]

On September 22, 2013, as the Connells returned home from dinner, Thompson and his partner were waiting for them outside. The Connells died in a hail of bullets, their bodies coming to rest outside the condominium entrance. Shell casings were located near Olga Connell's body and more shell casings of a different caliber were located near Joe Connell's body, lying several feet away.

Rivers, Bey, and Benson were all arrested well before Thompson was. Then Bey "flipped" against his co-conspirators. Rivers and Benson were tried first. Thompson's arrest came just weeks before the start of their trial. Thompson's trial followed.

---

[2] The State sought to prove that both Thompson and Benson killed the Connells. The jury hung on Benson's murder charges and convicted him of conspiracy. Although a hung verdict does not mean Benson is innocent, this decision simplifies the trial outcomes by treating Thompson as the only shooter.

[3] Adding insult to injury, Bey received only $5,000, which he gave to Thompson.

## B. The Trial

It is not an exaggeration to say that Bey's testimony played a pivotal role in all the "Paladin Club" murder trials.[4]  Indeed, there may not have been any trials without Bey's cooperation.  But Bey was a turncoat who accepted a plea offer in exchange for incriminating his co-conspirators.  The State thus focused most of its efforts on shoring up Bey's credibility in any way it could.  Three such efforts are relevant to Thompson's motion.

### 1. The Ballistics Evidence

No firearms were recovered at the murder scene or introduced at trial.  Bey did not testify to the make, model, or caliber of the firearms used because he was not at the scene of the murders and did not directly participate in arming the gunmen.  There were, however, shell casings recovered at the scene.

The State called Carl Rone ("Rone"), who was then employed by the Delaware State Police ("DSP"), as a ballistics expert.  Rone did not examine a murder weapon.[5]  He had, however, prepared two reports on the shell casings.  One report was prepared in 2016.  Both reports were peer reviewed by his colleagues.[6]

---

[4] For a synopsis of Bey's testimony against Thompson, the Court directs interested readers to the Supreme Court's decision on Thompson's direct appeal. *See generally Thompson v. State*, 205 A.3d 827, 829–31 (Del. 2019).  *See also supra* note 1 (collecting additional background).

[5] *See, e.g.*, Vol. A to Post-Conviction R. at 67 (hereinafter "A[#]"); Vol. B to Post-Conviction R. at 198–201, 212–13 (hereinafter "B[#]").

[6] *See, e.g.*, A26–57.

Rone testified that some of the bullets were fired from the same gun.[7] But he was unable to opine on whether the remaining bullets were fired from one gun or multiple guns.[8] Most important, Rone did not identify Thompson—or anyone else—as the shooter or offer evidence suggesting that any person in particular was present when and where the Connells were killed.

Rone figures prominently in Thompson's motion. But he played a very minor role in the trial.

### 2. The "Vesta" Evidence

Critical evidence corroborating Bey's testimony came in the form of Cell Site Location Information ("CSLI"). Specifically, the movements of cell phones on the night of the murder corroborated Bey's testimony about his communications with Benson and Thompson.

One such phone was a disposable cell phone (the "Kenny AAAA" phone), which was identified near the crime scene when the murders occurred. That phone was purchased from Metro PCS. Thompson owned a regular cell phone, which he purchased from T-Mobile. But the State believed Thompson also owned the Kenny AAAA phone. The State sought to support its belief with four pieces of evidence.

---

[7] *See, e.g.*, A62–65; B198–201, 212–13.

[8] *See, e.g.*, A67; B202–04, 213–17. Forensic evidence obtained by a DSP detective from the Connells' bodies suggested that two guns were used. B2–5, 8–11. But the detective likewise could not testify as to whether two guns were in fact used.

First, the Kenny AAAA phone contacted Benson on the night of and just before the murders occurred.[9] Second, Thompson's girlfriend contacted the Kenny AAAA phone shortly after the murders occurred.[10] Third, the Kenny AAAA phone ran on a pre-paid number of "minutes." And fourth, Thompson's banking records indicated that, throughout 2013, he had been using an electronic intermediary, "Vesta," to make periodic transfers resembling "minutes" payments to T-Mobile.[11]

The State's evidence had holes. For one thing, unlike Thompson's other phone, the Kenny AAAA phone was carried by Metro PCS, not T-Mobile.[12] For another, the banking records showed that Thompson did not make a Vesta payment to Metro PCS until June 2014—*i.e.*, nine months after the murders.[13] Given these discrepancies, Thompson argued that he did not own the Kenny AAAA phone and that his 2013 Vesta payments to T-Mobile were made for his personal phone.

To rebut Thompson's arguments, the State called a T-Mobile records custodian. The witness explained why a 2013 Metro PCS customer would be billed by T-Mobile for Metro PCS's network. According to the witness, T-Mobile acquired Metro PCS in 2013 using a merger structure that kept the companies

---

[9] *See, e.g.*, B102–13.
[10] *See, e.g.*, B94–101.
[11] *See, e.g.*, A84–87, 91, 96, 98, 118–22.
[12] *See, e.g.*, A118–21.
[13] *See, e.g.*, A87.

operationally distinct.[14]     In other words, the merger testimony refashioned Thompson's "T-Mobile" payments as Metro PCS payments.

Trial Counsel objected.  Trial Counsel argued that there was no evidence of a merger or when it occurred.[15]   Without that evidence, the defense feared the custodian's testimony would compel an inference that Thompson owned the Kenny AAAA phone.   That inference would be "wrong," according to Trial Counsel, because the State's records showed Vesta payments to two different wireless companies.[16]  After hearing argument, the Court overruled the objection, finding that the objection went to weight, not admissibility, and so could be addressed on cross-examination.[17]

The defense's cross-examination clarified that Thompson's 2013 Vesta payments were made to T-Mobile, not Metro PCS.[18]   Better, the defense elicited from a DSP detective that the Kenny AAAA phone was deactivated in October 2013—*i.e.*, a month after the murders but eight months before Thompson made the Vesta payment to Metro PCS.[19]  This gap enabled Trial Counsel to argue that, in 2013, Thompson was using Vesta to pay for his T-Mobile phone, while in 2014, he

---

[14] *See, e.g.*, B16–17.
[15] *See, e.g.*, B115–23.
[16] *See, e.g.*, B120–21.
[17] *See, e.g.*, B130–31.
[18] *See, e.g.*, B141.
[19] *See, e.g.*, B140–41.

was using Vesta to pay for a different or new, Metro PCS phone.[20] Trial Counsel emphasized that a 2014 Metro PCS phone payment could not be for the Kenny AAAA phone because the Kenny AAAA phone had been deactivated 2013.[21]

### 3. The "Commerce Street" Evidence

Thompson worked for a company called Leonard's Express Trucking. At trial, the parties assumed that Leonard's owned two parking lots in 2013: one at 300 Pigeon Point Road in New Castle and the other at 20 Commerce Street in Wilmington. The Commerce Street location was seven minutes away from the Paladin Club.[22]

The State called an FBI agent as its CSLI expert. The agent testified that, before and after the murders, CSLI located Thompson's phone near the crime scene.[23] Specifically, the agent testified that Thompson's phone was in the vicinity of Route 9 and the I-95 at the time.[24] Based on the geographical area covered by the cell towers, the Route 9 and I-95 vicinity was triangulated within the same region as the 20 Commerce Street lot.[25]

---

[20] *See, e.g.*, B178–80, 186–87.
[21] *See, e.g.*, *id.*
[22] *See, e.g.*, A346.
[23] *See, e.g.*, A313–24.
[24] *See, e.g.*, A318–19.
[25] *See, e.g.*, B112–13.

The CSLI was incriminating. But one of Thompson's supervisors testified that Thompson was working on the night of the murders.[26] And this supported the defense's story. The defense portrayed Thompson as a hard-worker with steady income who did not need and would not want to commit a murder for money. Recognizing this, the State sought to argue that Thompson *was* "at Leonard's Trucking," except with a different purpose than the defense depicted.

To that end, the State asked Thompson's supervisor for Leonard's Trucking's address.[27] The State did not specify a timeframe. The supervisor answered, in the present tense, that one of Leonard's addresses is located on 20 Commerce Street.[28] The supervisor's testimony, coupled with the CSLI, allowed the State to theorize that Thompson used Leonard's as a front: he wanted an onlooker to misbelieve that he was "at work," rather than parked and waiting for a signal to kill the Connells.[29]

## C. The Post-Trial

The jury convicted Thompson on all charges. The Court sentenced him to two terms of life imprisonment plus 45 years at Level V. He appealed.

### 1. The Appeal (Pre-Rone Indictment)

---

[26] *See, e.g.*, B18–39.
[27] *See, e.g.*, A325–26.
[28] *See, e.g.*, *id.*
[29] *See, e.g.*, A348.

Trial Counsel represented Thompson on his direct appeal. In his opening brief, Trial Counsel argued three claims.[30] Each claim involved Bey's testimony and credibility and their effects on the jury. None of the claims involved Rone.

### 2. The Rone Indictment

In 2018, Rone was indicted.[31] The State alleged that, over the course of 2016 and 2017, Rone falsified some of his time sheets to obtain unearned compensation. Rone's wrongdoing overlapped his 2016 expert report and Thompson's 2017 trial. But the State's indictment never alleged that Rone fabricated any of his ballistics reports or accused Rone of committing perjury while on the witness stand.

After filing the opening brief in Thompson's direct appeal, Rone retained Trial Counsel to represent him in the Superior Court. Rone ultimately pleaded guilty to misdemeanor theft charges. He was sentenced to a period of probation and ordered to make restitution to the State for the stolen compensation.

### 3. The Appeal (Post-Rone Indictment)

As of Rone's convictions, Thompson's appeal still was not fully submitted. Trial Counsel did not supplement Thompson's appellate pleadings with arguments concerning Rone's trial testimony or his credibility during Thompson's trial. He also did not request a new trial or a remand for Thompson in light of Rone's

---

[30] Appellant's Opening Br. at 18–35, *Thompson v. State*, 205 A.3d 827 (Del. 2019) (No. 454,2017), D.I. 15.

[31] *See generally State v. Rone*, 2018 WL 4482462 (Del. Super. Ct. Sept. 17, 2018).

conviction. Instead, Trial Counsel filed a reply brief that reiterated the arguments he made on behalf of Thompson in his opening brief.[32]

On February 21, 2019, the Supreme Court affirmed Thompson's convictions.[33] The Supreme Court's mandate was issued on March 13, 2019.[34]

## D. This Motion

This motion followed. On April 8, 2019, Thompson moved *pro se* under Rule 61 for post-conviction relief. On April 18, 2019, the Court appointed counsel ("PCR Counsel") to represent Thompson. On January 29, 2021, Thompson filed a second amended Rule 61 motion. On August 18, 2021, Trial Counsel filed a responsive affidavit. On January 7, 2022, the State opposed Thompson's motion. On February 8, 2022, Thompson replied. The motion is now ripe for decision.

### 1. The Post-Conviction Discovery Efforts

PCR Counsel diligently investigated Thompson's claims. For example, PCR Counsel obtained the discovery the State produced to Trial Counsel in the Rone case.[35] PCR Counsel then subpoenaed a number of executive agencies to determine whether Rone falsified his time sheets on the dates he prepared the ballistics reports

---

[32] Appellant's Reply Br. at 1–10, *Thompson v. State*, 205 A.3d 827 (Del. 2019) (No. 454,2017), D.I. 19.

[33] Op., *Thompson v. State*, 205 A.3d 827 (Del. 2019) (No. 454,2017), D.I. 29

[34] Mandate, in *id.*, D.I. 31.

[35] *See, e.g.*, A204–05, 207, 210, 213, 216, 244, 246, 254–55.

that were introduced at Thompson's trial.[36]  PCR Counsel also tried to subpoena Rone to compel production of any records the government did not possess.[37] Separately, PCR Counsel investigated the background of the T-Mobile-Metro PCS merger and Leonard's 2013 ownership of the 20 Commerce Street parking lot.[38] Where relevant, the Court will address Thompson's post-conviction evidence below.

## 2. The Claims for Relief

Thompson does not maintain his innocence.  Instead, Thompson brings four ineffective assistance claims.  Two are based on Trial Counsel's appellate performance and two are based on Trial Counsel's trial performance.  Trial Counsel has filed an affidavit in which he denies all the allegations.[39]

### a. The Conflict Claims

Thompson alleges that Trial Counsel's simultaneous representation of Rone in the Superior Court while Thompson's case was on appeal denied Thompson his right to counsel (the "Conflict Claims").[40]  Specifically, Thompson alleges the multiple representation created an actual and *per se* prejudicial conflict of interest

---

[36] *See, e.g.*, Vol. C. to Post-Conviction R. at 1–66.
[37] Subpoena *Duces Tecum*, *State v. Thompson* (Cr. No. 1602016732), D.I. 128.
[38] *See, e.g.*, Def.'s 2d Am. R. 61 Mot. at 63–66 (discussing collected cases); A359.
[39] *See generally* Maurer Aff.
[40] The Conflict Claims are pluralized because Thompson makes the same allegation twice: first under federal law and again under Delaware law.  As discussed below, the Delaware law version is not recognized by existing precedent.  *See infra* Analysis.B § 1(b)(iv).  Even so, the Court retains the plural form for convenience.

that prevented Trial Counsel from challenging Rone's testimony and character on appeal. Thompson seeks an evidentiary hearing on the Conflict Claims.[41]

Trial Counsel denies the Conflict Claims. He states that he "did not even consider that there was any potential problem . . . [or] conflict of interest" or "that there could be one."[42] Trial Counsel affirms that he did not attack Rone's character on appeal because Rone's testimony was not helpful to the State's case or harmful to Thompson's defense:

> [C]ounsel did not challenge the ballistics evidence . . . and, in particular, the testimony presented by [] Rone[] [because] Counsel did not believe that the [ballistics] evidence was significant insofar as the defense theory was concerned . . . . [O]n direct appeal . . . nothing relating to the ballistics evidence was argued or considered as an issue . . . .[43]

### b. The Vesta Claim

Thompson alleges that Trial Counsel was ineffective because he did not meaningfully challenge the evidence of Thompson's Vesta payments (the "Vesta Claim"). According to Thompson, there was public information available during his trial tending to show that Vesta could not be used to pay for a Metro PCS phone in 2013. The "public information" to which Thompson refers is caselaw from a federal court in Oregon. Thompson seeks a new trial as relief for the Vesta Claim.[44]

---

[41] Def.'s 2d Am. R. 61 Mot. at 83.
[42] Maurer Aff. ¶ 8.
[43] *Id.* ¶¶ 7–8.
[44] Def.'s 2d Am. R. 61 Mot. at 83.

Trial Counsel denies the Vesta Claim. He states that he objected to the Vesta payment records.[45] He also states that the defense undermined the Vesta payments anyway because it showed that "Thompson made payments [through] Vesta after [the Kenny AAAA Phone] stopped being used."[46]

### c. The Commerce Street Claim

Finally, Thompson alleges Trial Counsel was ineffective because he failed to point out that Leonard's Trucking did not own the 20 Commerce Street lot at the time of the murder (the "Commerce Street Claim"). Thompson supports this allegation with an unreported interview between a defense investigator and a Leonard's Trucking representative who says Leonard's did not become the owner of 20 Commerce Street until 2014, a year after the murder. The error was prejudicial, in Thompson's view, because the State stressed that he was "at Leonard's" on the night of the murder. Thompson seeks a new trial as relief for this Claim.[47]

Trial Counsel denies the Commerce Street Claim. He states that ownership of the parking lot was not important because "there were not many cell towers in the area" and Thompson was identified in the general vicinity of 20 Commerce Street.[48] Counsel also reiterates that the defense sought to portray Thompson as an assiduous

---

[45] Maurer Aff. ¶ 9.
[46] *Id.*
[47] Def.'s 2d Am. R. 61 Mot. at 83.
[48] Maurer Aff. ¶ 10.

person who was "at work" on the night of the murders.[49]  Accordingly, Trial Counsel suggests that allowing the jury to believe Thompson was "at Leonard's" was "strategic" because it supported the defense's narrative.[50]

## STANDARD OF REVIEW

A defendant may move under Criminal Rule 61 for post-conviction relief.[51] Rule 61 "balances" the law's interest in conviction finality "against . . . the important role of the courts in preventing injustice."[52]  Although the availability of collateral review reintroduces uncertainty into completed criminal proceedings, the ("extremely rare") possibility of undetected innocence or a comparable miscarriage of justice "overrides" its disruptive effects.[53]

In the generic case, however, there must be a "definitive end to the litigable aspect of the criminal process."[54]  Collateral review "ensure[s] that individuals are not imprisoned" wrongly; it is not designed to correct minor "errors of fact."[55]

---

[49] *Id.* ¶ 11.
[50] *Id.*
[51] Del. Super. Ct. Crim. R. 61.
[52] *Zebroski v. State*, 12 A.3d 1115, 1120 (Del. 2010).
[53] *Schlup v. Delo*, 513 U.S. 298, 321 (1995).
[54] *Flamer v. State*, 585 A.2d 736, 745 (Del. 1990).  *See McCleskey v. Zant*, 499 U.S. 467, 491 (1991) ("Without finality, the criminal law is deprived of much of its deterrent effect." (internal quotation marks omitted)); *Kuhlmann v. Wilson*, 477 U.S. 436, 453 (1986) (plurality opinion) (noting rehabilitative aspects of finality).
[55] *Herrera v. Collins*, 506 U.S. 390, 400 (1993).

"Calibrated to screen for the wrongfully convicted, Rule 61 should not be used to launch *post hoc* strikes on issues inessential to a judgment of guilt."[56]

Rule 61 does not "allow defendants unlimited opportunities to relitigate their convictions."[57] To deter abusive collateral litigation, the standards and presumptions "adopted" under post-conviction rules purposefully have made "winning [collateral] relief difficult[.]"[58] Because convictions are "presumed valid," a defendant seeking to overturn a conviction "bears a heavy burden."[59] In discharging that burden, the defendant must contend with a "presumption of regularity."[60] "The presumption of regularity attaches to all final judgments . . . and implies those judgments have been done rightly until contrary evidence appears."[61] Accordingly, Rule 61 shifts to the defendant the burden of demonstrating that his

---

[56] *State v. Owens*, 2021 WL 6058520, at *10 (Del. Super. Ct. Dec. 21, 2021).

[57] *Ploof v. State*, 75 A.3d 811, 820 (Del. 2013).

[58] *Brown v. Davenport*, 142 S. Ct. 1510, 1526 (2022). *See generally Brown v. Allen*, 344 U.S. 443, 537 (1953) (Jackson, J., concurring in the judgment) ("It must prejudice the occasional meritorious [collateral] application to be buried in a flood of worthless ones. He who must search a haystack for a needle is likely to end up with the attitude that the needle is not worth the search.").

[59] *Higgason v. Clark*, 984 F.2d 203, 208 (7th Cir. 1993). *Accord Meyers v. Gillis*, 93 F.3d 1147, 1151 (3d Cir. 1996); *see also* Restatement (First) of Judgments §§ 4, 11 (1952).

[60] *E.g.*, *Parke v. Raley*, 506 U.S. 20, 29 (1992); *accord Xenidis v. State*, 2020 WL 1274624, at *2 (Del. Mar. 17, 2020).

[61] *Xenidis*, 2020 WL 1274624, at *2.

conviction is not supported by a "sufficient factual and legal basis" that otherwise will be presumed.[62]

## ANALYSIS

A Rule 61 analysis proceeds in two steps. First, the Court must determine whether the motion is procedurally barred.[63] If it is not barred, the Court next reviews the motion's merits on a claim-by-claim basis.[64] As explained below, Thompson's motion is not barred,[65] but it fails to state a claim for collateral relief.

### A. Thompson's motion is not procedurally barred.

Rule 61 is nothing "other than a procedural device[.]"[66] As a result, there are "several" procedural "limitations on the availability of postconviction relief."[67] Rule 61 contains four procedural bars that, if applicable, preclude review of all or part of the defendant's motion.[68] Rule 61 bars claims that are untimely,[69] successive,[70] defaulted,[71] or formerly adjudicated.[72]

---

[62] Del. Super. Ct. Crim. R. 61(a)(1). *See, e.g., Dorsey v. State*, 2007 WL 4965637, at *1–2 (Del. Nov. 6, 2007).
[63] *E.g., Younger v. State*, 580 A.2d 552, 554 (Del. 1990).
[64] *E.g., State v. Reyes*, 155 A.3d 331, 342 n.15 (Del. 2017).
[65] A reviewing court could conclude that the Vesta Claim is procedurally barred. *See infra* Analysis.A.
[66] *Bailey v. State*, 588 A.2d 1121, 1125 (Del. 1991).
[67] *Ploof*, 75 A.3d at 820.
[68] *See generally* Del. Super. Ct. Crim. R. 61(i)(1)–(4).
[69] *Id.* R. 61(i)(1).
[70] *Id.* R. 61(i)(2).
[71] *Id.* R. 61(i)(3).
[72] *Id.* R. 61(i)(4).

The Conflict and Commerce Street Claims are not procedurally barred. These Claims are timely, are not successive, and were not previously adjudicated. They also are not defaulted because they allege ineffective assistance of counsel, which "generally cannot be raised at trial or on direct appeal."[73]

The Vesta Claim is a closer call. The Vesta Claim is timely and not successive. Crediting its "ineffective assistance" *title*, the Vesta Claim is not defaulted either. Even so, the Vesta Claim appears to have been adjudicated already.

Under Rule 61(i)(4), "[a]ny ground for relief that was formerly adjudicated . . . in the proceedings leading to the judgment of conviction . . . is thereafter barred." At trial, Thompson argued that the State's Vesta records could not show that Thompson paid Metro PCS in 2013. The Court rejected this argument. A trial plainly is a "proceeding[] leading to the judgment of conviction[.]"[74] And the Court's decision plainly is a former "adjudication."[75] If the Vesta Claim is formerly adjudicated, then it cannot be reviewed unless Thompson pleaded with particularity

---

[73] *Malloy v. State*, 2011 WL 1135107, at *2 (Del. Mar. 28, 2011). *See, e.g.*, *Green v. State*, 238 A.3d 160, 175 (Del. 2020) ("Simply put, ineffective-assistance claims are not subject to Rule 61(i)(3)'s bar because they cannot be asserted in the proceedings leading to the judgment of conviction under the Superior Court's rules and this Court's precedent. Put yet another way, the failure to assert an ineffective-assistance-of-counsel claim in the proceedings leading to the judgment of conviction is not a procedural default." (footnote omitted)).

[74] Del. Super. Ct. Crim. R. 61(i)(4).

[75] *See Adjudication*, Black's Law Dictionary (11th ed. 2019) (defining adjudication as "[t]he legal process of resolving a dispute").

new evidence creating a strong inference of his actual factual innocence or a new constitutional rule that operates retroactively on collateral review to invalidate his convictions.[76] He did not.

Thompson's contrary framing does not make much of a difference. Thompson classifies the Vesta Claim as an ineffective assistance claim. But titles are not dispositive. Rule 61(i)(4) "precludes" a defendant "from relitigating" a previously adjudicated issue "under the guise of ineffective assistance of counsel."[77]

True, Thompson now articulates the Vesta Claim more precisely than Trial Counsel did. But "a defendant is not entitled to have a court re-examine an issue that has been previously resolved 'simply because the claim is refined or restated.'"[78] That remains law even though the Vesta Claim was not raised on appeal. Rule 61(i)(4) applies to trial rulings that are not challenged on appeal.[79] And Thompson

---

[76] Del. Super. Ct. Crim. R. 61(d)(2), (i)(5).

[77] *Shelton v. State*, 744 A.2d 465, 485 (Del. 2000). *See, e.g.*, *Owens*, 2021 WL 6058520, at *12 n.108 ("Rule 61's procedural bars would have no teeth if a post-conviction defendant could avoid them by simply recasting . . . precluded challenges in the language of ineffectiveness.").

[78] *Skinner v. State*, 607 A.2d 1170, 1172 (Del. 1992) (quoting *Riley v. State*, 585 A.2d 719, 721 (Del. 1990)).

[79] *See* Del. Super. Ct. Crim. R. 61(i)(4) (using a disjunctive "or" to separate "proceedings leading to the judgment of conviction" and "in an appeal"). *E.g.*, *State v. Johnson*, 2021 WL 1407362, at *2 (Del. Super. Ct. Apr. 13, 2021) (barring as formerly adjudicated claim that was rejected during pre-trial suppression hearing, even though defendant did not take direct appeal). As explained shortly, the Delaware Supreme Court has recognized that, when the "underlying merits" of a claim are formerly adjudicated, "a follow-on ineffective [] assistance" version of that claim may be "considered formerly adjudicated" too. *Green*, 238 A.3d at 176.

does not allege that Trial Counsel was ineffective for failing to raise the Vesta Claim on appeal.

Despite all this, the Court will review the Vesta Claim on the merits. The Delaware Supreme Court has advised against a free-wheeling approach to procedurally barring ineffective assistance claims. In *Green v. State*,[80] the Supreme Court cautioned that an ineffective assistance claim should not be barred simply because it "might bear some resemblance to a formerly adjudicated claim."[81] Applying that guidance, *Green* distinguished an ineffective assistance claim that has been rendered substantively "futile" by past review from an ineffective assistance claim that has been rendered procedurally barred by a prior adjudication.[82] The

*Accord State v. Dunnell*, 2021 WL 1716647, at *8–9 (Del. Super. Ct. Apr. 30, 2021) (using this logic to bar ineffective assistance version of evidentiary claim that received "substantive[] review[] . . . on direct appeal"). So the Supreme Court appears to have cabined Rule 61(i)(4) to former adjudications on the merits. *See Green*, 238 A.3d at 176 (declining to apply Rule 61(i)(4) to ineffective assistance claim that was previously adjudicated for "plain error" but not on its "substantive . . . merit"). At trial, the Court rejected Trial Counsel's arguments on the merits in finding that the Vesta records were admissible.

[80] 238 A.3d 160 (Del. 2020).

[81] *Id.* at 176. *Cf. id.* at 187 (Vaughn, J., concurring) (observing that "some parts" of ineffective assistance claim "were not raised at trial or on appeal" and so were "not formerly adjudicated" for purposes of indirect appeal).

[82] *Id.* at 176.

20

Supreme Court did not explore or define this distinction, but it appears that "futile" ineffective assistance claims, although academic, are nonetheless reviewable.[83]

As discussed below, the Vesta Claim fails for substantially the same reasons it failed at trial. It is thus futile, rather than procedurally barred. Moreover, the State has not asserted Rule 61(i)(4). The Court is not required to deploy a procedural bar on the State's behalf.[84] Accordingly, the Court will review all Thompson's Claims, even though the Vesta Claim "might rightly be considered" procedurally barred.[85]

## B. The Conflict Claims fail to state a claim for post-conviction relief.

Ineffective assistance claimants ordinarily must demonstrate prejudice to obtain relief.[86] There is an exception, of sorts, crafted in cases involving attorney conflicts of interest. Where there is an "actual conflict," prejudice to the accused is presumed.[87] To determine whether these facts trigger an "actual conflict," some parsing is necessary. And as we will see, the "presumption of prejudice" is somewhat misleading, as an "actual conflict" is only found where the lawyer's

---

[83] *See id.* (observing that "[t]here are times when" prior rejection of a substantive claim "will render a follow-on ineffective assistance claim futile" and times when an ineffective assistance claim "might" be considered formerly adjudicated).

[84] *See Younger*, 580 A.2d at 556 ("Neither federal nor state courts are *required* to relitigate in postconviction proceedings those claims [that] have been previously resolved." (emphasis added)); *cf. Trest v. Cain*, 522 U.S. 87, 89 (1997) (holding that federal courts are not "required" to raise a "procedural default" *sua sponte*).

[85] *Green*, 238 A.3d at 176.

[86] *See generally Strickland v. Washington*, 446 U.S. 668, 687 (1984).

[87] *See generally, e.g.*, *Cuyler v. Sullivan*, 446 U.S. 335 (1980).

performance "adversely affects" the client. This essentially centralizes a prejudice to the client element in the definition, rather than as a consequence of the assistance.

It is also worth reiterating that Trial Counsel was representing Thompson on his direct appeal and had filed his opening brief before representing Rone in Superior Court. We will assume, for purposes of further discussion, that this constituted a species of "multiple representation," although doing so is a bit of a stretch.

**1. Thompson is not entitled to a presumption of prejudice because Trial Counsel did not actively represent an actual conflict of interest that adversely affected his performance during Thompson's direct appeal.**

The Sixth Amendment guarantees "the right to effective assistance of counsel."[88] As a "correlative" to this guarantee,[89] "[t]he Sixth Amendment . . . provides for representation that is free from conflicts of interest[.]"[90] Because the "precise impact" of a conflict of interest "is difficult to measure[,]"[91] a defendant may succeed on a conflict-based ineffective assistance claim without producing "nice calculations as to the amount of prejudice" the conflict caused.[92] Accordingly, "a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief."[93]

---

[88] *Urquhart v. State*, 203 A.3d 719, 728 (Del. 2019) (internal quotation marks omitted).
[89] *Wood v. Georgia*, 450 U.S. 261, 271 (1981).
[90] *Lewis v. State*, 757 A.2d 709, 714 (Del. 2000) (internal quotation marks omitted).
[91] *Purnell v. State*, 254 A.3d 1053, 1111 (Del. 2021).
[92] *Glasser v. United States*, 315 U.S. 60, 76 (1942).
[93] *Cuyler*, 446 U.S. at 349–50.

The mere presence of a conflict does not relieve the defendant of demonstrating prejudice. "[T]he *possibility* of a conflict is insufficient to impugn a criminal conviction."[94] So the presumption of prejudice does not apply unless the defendant "demonstrate[s] that an *actual* conflict of interest *adversely affected his lawyer's performance*."[95] Accordingly, "prejudice is presumed '*only if* the defendant demonstrates that counsel actively represented conflicting interests and that 'an actual conflict of interest adversely affected his lawyer's performance.'"[96]

The Court reviews *de novo* the question of whether an actual conflict of interest adversely affected a lawyer's performance.[97] An "actual, relevant conflict of interest[] [exists] if, during the course of the representation, the defendants' interests *do diverge* with respect to a *material* legal or factual issue or to a course of

---

[94] *Id.* at 350 (emphasis added).

[95] *Id.* at 348 (emphases added). *Cf. Hess v. Mazurkiewicz*, 135 F.3d 905, 910 (3d Cir. 1998) ("If the accused can establish only a potential conflict of interest, prejudice must be proved.").

[96] *Lewis*, 757 A.2d at 718 (emphasis added) (quoting *Strickland*, 446 U.S. at 692).

[97] *E.g.*, *Tillery v. Horn*, 142 F. App'x 66, 69 (3d Cir. 2005) (citing *Cuyler*, 446 U.S. at 341–42).

action."[98]  Put another way, "[a]n actual conflict exists when a movant can show that counsel actually had divided loyalties that affected his or her performance."[99]

"Since a possible conflict inheres in almost every instance of multiple representation,"[100] an actual conflict is "more likely to occur in cases of joint representation—representation of more than one defendant at the same trial—rather than . . . multiple representation—representations of defendants in different trials."[101]  Where, as here, the defendant alleges a conflict arising from multiple representation, he must show that his lawyer took "a positive step" on behalf of one client but was "passive and failed to act" on the defendant's behalf.[102]  Conversely, if the defendant alleges "passive lapses" rather than "positive acts[,]" he must

> first . . . demonstrate that some plausible alternative defense strategy or tactic might have been pursued.  He need not show that the defense would necessarily have been successful if it had been used, but that it possessed sufficient substance to be a viable alternative.  Second, he must establish that

---

[98] *Cuyler*, 446 U.S. at 356 n.3 (Marshall, J., concurring in part and dissenting in part) (emphases added) (internal quotation marks omitted).  *Accord Lewis*, 757 A.2d at 718 (adopting Justice Marshall's definition); *see Gov't of V.I. v. Zepp*, 748 F.2d 125, 136 (3d Cir. 1984) (using similar definition); *Melendez v. Carroll*, 2006 WL 38921, at *4 (D. Del. Jan. 5, 2006) (using similar definition).  *Cf.* Del. Laws.' Rules of Prof'l Conduct R. 1.7(a) & cmt. 1 (Off. of Disciplinary Couns. 2020) (defining "concurrent" conflicts of interest using similar principles and language).

[99] *Purnell*, 254 A.3d at 1105 (internal quotation marks omitted).

[100] *Cuyler*, 446 U.S. at 348.

[101] *United States v. Morelli*, 169 F.3d 798, 810 (3d Cir. 1999).

[102] *Duncan v. Morton*, 256 F.3d 189, 197 (3d Cir. 2001).  *Accord Tillery*, 142 F. App'x at 70; *see Holloway v. Arkansas*, 435 U.S. 475, 490 (1978) (identifying an attorney's decision to "refrain from" advocating on behalf of one client in favor of advocating for another as the principal "evil" of conflicted representation).

the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.[103]

"Until . . . [the] defendant shows that his counsel *actively represented* conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance."[104]

### a. Trial Counsel's decision to forgo attacks on Rone was consistent with Thompson's interests, which otherwise did not materially diverge from Rone's interests.

Thompson argues that Trial Counsel had an actual conflict because Rone and Thompson's interests were "incompatible."[105]  In Thompson's view, Rone had an interest in vindicating his own credibility, whereas Thompson had an interest in challenging it.  This reasoning overstates Rone's role at trial and concludes, without having shown, that Trial Counsel's choice to avoid Rone on appeal was due to a conflict and nothing else.  But Rone's testimony was barely relevant to the State's case.  So attacking Rone on appeal would not have resulted in a new trial.   Trial Counsel left Rone out of Thompson's appeal because Rone was of no use to Thompson on appeal, not because of some conflicting interest with Rone.

---

[103] *Duncan*, 256 F.3d at 197 (alteration and internal quotation marks omitted).
[104] *Mickens*, 535 U.S. at 175 (alteration and internal quotation marks omitted).
[105] Def.'s 2d Am. R. 61 Mot. at 31.

The Connells' cause of death was not in dispute: it was no mystery that they were shot to death. But no firearms were recovered. And no one saw the shooter(s). So the case was a "whodunit," not a "what happened."

Rone testified to what happened, not who did it. Rone performed inconclusive ballistics analyses on bullets discharged by an unidentified shooter from a missing firearm. He then made the unremarkable observation that at least some of the bullets came from a gun. Rone's scientific display might have entertained the jury, thereby curtailing the so-called "CSI effect."[106] But he did little, if anything, to help prove beyond a reasonable doubt that Thompson killed the Connells.

Bey was the witness with personal knowledge of Thompson's participation and ultimately, he was the only source of direct evidence. The State needed Bey. It did not need Rone.

_____

[106] The CSI effect is a quasi-psychological phenomenon that describes how forensic television shows may distort the jury's perception of the size of the State's burden. As courts and scholars have documented, failure to introduce forensic evidence, even when it is irrelevant and sufficient, non-forensic evidence has been adduced, can lead juries to acquit based on an unfounded belief that the State under-investigated its case or misidentified the defendant. *See generally State v. Cooke*, 914 A.2d 1078, 1083–88 (Del. Super. Ct. 2007); Tom R. Tyler, *Viewing CSI and the Threshold of Guilt: Managing Truth and Justice in Reality and Fiction*, 115 Yale L.J. 1050 (2006). There is good reason to think that the CSI effect is not a bit of folklore. In at least one Delaware case, a defendant challenged the State's attempt to diminish the CSI effect. *See Morgan v. State*, 922 A.2d 395, 401–03 (Del. 2007). In *Morgan*, the State told the jury that forensic testing was not necessary because the testing "would not have worked." *Id.* at 401. Although it approved the comments on plain error review, the Supreme Court thought that the comments "undoubtedly" would have been stricken had the defendant objected at trial. *Id.* at 403.

True, Bey was a co-conspirator. His credibility could not have been more at issue. But Rone's evidence did not corroborate Bey's testimony. Bey testified that the bullets at the scene came from Thompson. Rone testified that the bullets at the scene came from a gun.

Given the importance of Bey's character and testimony to Thompson's convictions, it is not surprising that Trial Counsel focused all of Thompson's appellate arguments on Bey and not Rone. Trial Counsel's arguments "maximize[d]" the likelihood" that Thompson's convictions would be overturned.[107] Rone-based arguments did not.

Properly understood, Trial Counsel was *loyal* to Thompson. Thompson wanted his convictions overturned. Arguments against Bey gave him the best chance of doing so. Accordingly, Trial Counsel disregarded Rone not due to an actual conflict, but rather because Rone was irrelevant to Thompson's defense.[108] Indeed, "nothing relating to the ballistics evidence was . . . considered . . . an issue" on appeal.[109]

Nor did Thompson and Rone's interests "diverge . . . material[ly]" once Thompson appealed and Rone was indicted.[110] Thompson needed to show the

---

[107] *Neal v. State*, 80 A.3d 935, 946 (Del. 2013) (internal quotation marks omitted).
[108] Maurer Aff. ¶¶ 7–8.
[109] *Id.*
[110] *Cuyler*, 446 U.S. at 356 n.3 (Marshall, J., concurring in part and dissenting in part). *Accord Lewis*, 757 A.2d at 718 (adopting Justice Marshall's definition).

27

Supreme Court that his convictions were infirm. Rone needed to convince a jury that he was not a thief. But Rone's work was not material to Thompson's trial. Necessarily, then, Thompson's appeal did not turn on Rone's credibility. That is why Trial Counsel "did not even consider that there was any potential problem . . . [or] conflict of interest" when he agreed to represent Rone.[111] He did not need to "actively represent[] conflicting interests" to advocate effectively for both clients.[112]

In the end, any conflict did not "adversely affect" Trial Counsel's performance.[113] Trial Counsel picked Bey over Rone as his target on appeal not because he had an actual conflict, but rather because the ballistics evidence would not have reversed Thompson's convictions. That decision was faithful to Thompson's objectives. It was not disloyal.[114] Having shown neither an adverse effect nor an actively conflicted representation, Thompson is not entitled to a presumption of prejudice.

### b. Thompson's contrary arguments do not show otherwise.

Thompson misattributes Trial Counsel's choice to forgo Rone as a subject of appellate briefing to an actual conflict. The Court has not found any evidence that the "multiple representation" adversely affected Trial Counsel's performance.

---

[111] Maurer Aff. ¶ 8.

[112] *Lewis*, 757 A.2d at 718 (internal quotation marks omitted).

[113] *See Mickens*, 535 U.S. at 172 n.5 (clarifying that an actual conflict "*is* a conflict of interest that adversely affects counsel's performance" (emphasis added)).

[114] *See Purnell*, 254 A.3d at 1105 (requiring divided loyalties for an actual conflict).

Accordingly, the Court does not find an "actual conflict." Thompson's contrary arguments are unavailing.

### i. The Impeachment Argument

Thompson contends that, but for an actual conflict, Trial Counsel could have alerted the Supreme Court to the evidence he obtained during his representation of Rone and then, at the very least, requested a remand to relitigate Rone's character. Thompson thus tacitly treats Trial Counsel's *failure to attack* Rone's character as a *decision to defend* Rone's character. In addition to ignoring Rone's irrelevance, this argument presupposes re-litigation of Rone's character would have been permitted.

Delaware courts have considered Rone's indictment and its impact on the reliability of his trial testimony.[115] In doing so, every court has reached the same conclusion. Discovery of new evidence that tends to impeach Rone's character is

---

[115] *See generally Dixon v. State*, 2021 WL 3404223 (Del. Aug. 4, 2021); *Sierra v. State*, 242 A.3d 563 (Del. 2020); *Davenport v. State*, 2019 WL 2513771 (Del. June 17, 2019); *Fowler v. State*, 194 A.3d 16 (Del. 2018); *State v. Smith*, 2022 WL 601865 (Del. Super. Ct. Feb. 25, 2022); *State v. Washington*, 2021 WL 5232259 (Del. Super. Ct. Nov. 9, 2021); *State v. Coleman*, 2021 WL 529427 (Del. Super. Ct. Feb. 12, 2021); *State v. Bezarez*, 2020 WL 3474145 (Del. Super. Ct. June 25, 2020); *State v. Damiani-Melendez*, 2020 WL 3474144 (Del. Super. Ct. June 23, 2020); *State v. Phillips*, 2019 WL 1110900 (Del. Super. Ct. Mar. 11, 2019); *State v. Romeo*, 2019 WL 918578 (Del. Super. Ct. Feb. 21, 2019); *State v. Pierce*, 2018 WL 4771787 (Del. Super. Ct. Oct. 1, 2018); *State v. George*, 2018 WL 4482504 (Del. Super. Ct. Sept. 17, 2018).

not a ground for invalidating a conviction unless Rone was "vital" to proving the defendant's guilt.[116]

A rule that limits character-based post-conviction relief to cases involving "vital" witnesses reflects the circumstances which new impeachment evidence may be deemed so material as to warrant a new trial. Evidence that "merely" impeaches

---

[116] *Fowler*, 194 A.3d at 22. *Accord Sierra*, 242 A.3d at 570; *Romeo*, 2019 WL 918578, at *29. *See, e.g.*, *Dixon*, 2021 WL 3404223, at *3–4 (Rone's indictment did not warrant new trial because the State proved defendant's guilt with evidence "other than that offered by Rone"); *Smith*, 2022 WL 601865, at *3 (Rone's indictment did not warrant new trial because Rone "did not testify"); *Washington*, 2021 WL 5232259, at *8 (Rone's indictment did not warrant new trial because Rone "was not central," as "other more significant evidence supported the jury's verdict"); *Coleman*, 2021 WL 529427, at *7 (Rone's indictment did not warrant new trial because Rone could not "link" his findings to "any gun" defendant used to commit murder); *Bezarez*, 2020 WL 3474145, at *3 (Rone's indictment did not warrant new trial because "Rone's testimony was not a key component of identifying the defendant as the perpetrator," as a video and eyewitnesses identified defendant); *Damiani-Melendez*, 2020 WL 3474144, *6 (Rone's indictment did not warrant new trial because "Rone's report added little, if anything, to the case, and was nearly, if not entirely, superfluous," as defendant's conviction "did not turn on Rone's report" and other evidence of guilt was "overwhelming"); *Phillips*, 2019 WL 1110900, at *7 (Rone's indictment did not warrant new trial because "Rone's report was not used to establish identity of the shooters," as "eyewitnesses provided that critical evidence" and evidence otherwise was "overwhelming"); *Romeo*, 2019 WL 918578, at *29 (Rone's indictment did not warrant new trial because "Rone's testimony was not at all vital to [defendant's conviction]" and an array of other evidence established defendant's guilt apart from Rone); *George*, 2018 WL 4482504, at *4 (Rone's indictment did not warrant new trial because Rone "could not match" his ballistics evidence to "any of the firearms in this case"). *See also Pierce*, 2018 WL 4771787, at *4–5 (Rone's indictment did not warrant exclusion of his testimony because Rone's indictment was returned nine years after he participated in chain of custody, which otherwise was independently corroborated).

a witness does not warrant a new trial.[117] To the contrary, new impeachment evidence warrants a new trial only if it "attacks the credibility of the witness in the case at bar specifically, rather than impeaching the witness's credibility in general."[118] Accordingly, a defendant who seeks a new trial just so he may attack a witness's credibility using the witness's past misconduct must show how the misconduct "undermined the credibility" of the witness's testimony in the defendant's particular case.[119]

Here, Rone pleaded guilty to falsifying his time sheets. Rone was not accused of, or convicted for, fabricating the expert reports he used against Thompson (or anyone else) or perjuring himself during Thompson's trial (or any time else). As a result, every court to consider Rone's indictment has found that stealing "extra pay" for oneself is not the same as "submitting . . . false evidence logs and testing documentation" against someone else.[120] So Trial Counsel could not impeach Rone using general bad character evidence that bore no relation to Thompson's guilt.

Generally impeaching Rone, whether on appeal or through a supplemental remand, was not a viable road to take.[121] In fact, it is not a viable road today.

---

[117] *Lloyd v. State*, 534 A.2d 1262, 1267 (Del. 1987).
[118] *Purnell*, 254 A.3d at 1098–99. *Accord Dixon*, 2021 WL 3404223, at *4.
[119] *Dixon*, 2021 WL 3404223, at *4. *See Hicks v. State*, 913 A.2d 1189, 1195 (Del. 2006) (denying new trial because impeachment evidence was not "substantive").
[120] *Pierce*, 2018 WL 4771787, at *3–4. *See supra* note 116 (collecting support).
[121] *E.g.*, *Hicks*, 913 A.2d at 1195 (denying new trial because proffered evidence was "merely impeaching" rather than "substantive").

Assuming Rone was a "vital" witness, Thompson's "new evidence" would *not* suggest that Rone falsified his testimony in this case.

PCR Counsel investigated the discovery the State produced to Trial Counsel during Rone's case. It showed that Rone doctored his work hours on October 3, October 10, October 11, October 19, and October 26, 2016.[122] Rone, however, authored the 2016 report on October 5, 2016.[123] That report also was peer reviewed.[124] And Thompson does not claim Rone's peers are unreliable. Taken together, Thompson would not have shown that "Rone's . . . convictions undermined the credibility of [his] testimony *in this case*."[125] This failure would be "dispositive[.]"[126]

### ii. The Positional Conflict Argument

Thompson's "positional conflict" argument is based on a distinguishable Delaware Supreme Court decision, *Williams v. State*.[127]

In *Williams*, defense counsel represented a capital defendant, Joseph Williams. After the penalty phase, the jury voted 10-2 in favor of death. Williams's defense counsel argued on appeal that the sentencing court *was not* required to give

---

[122] *See* Def.'s 2d Am. R. 61 Mot. at 11–13.
[123] *Id.* at 12.
[124] A26–57.
[125] *Dixon*, 2021 WL 3404223, at *4.
[126] *Id.*
[127] 805 A.2d 880 (Del. 2002).

"great weight" to the jury's vote, but did. At the same time, Williams's defense counsel represented another capital defendant, Sadiki Garden.[128] Garden received the exact opposite jury vote: 10-2 against death.[129] Defense counsel argued on Garden's appeal that the sentencing court *was* required to give "great weight" to the jury's vote, but did not.[130]

The Delaware Supreme Court found that Williams and Garden faced the same legal question: whether a sentencing court must give great weight to a jury's penalty recommendation.[131] But defense counsel's positions would have led to contradictory results. If Williams were right, then Garden would be executed. But if Garden were right, then Williams would be executed. The Supreme Court held this to be a "positional conflict." Defense counsel could not provide effective assistance to both clients without, quite literally, "compromising" one client in favor of the other.[132]

The Thompson-Rone representation did not present a positional conflict. If Trial Counsel were successful for Thompson, that would not mean Rone falsified

---

[128] *Garden v. State*, 815 A.2d 327 (Del. 2003).

[129] The jury recommended a life sentence instead.

[130] *Garden* has a lively procedural history. On remand for failing to apply the correct standard, the court re-imposed Garden's death sentence. *See State v. Garden*, 831 A.2d 352 (Del. Super. Ct. 2003). The Supreme Court reversed again and ordered the court to impose a life sentence. *See Garden v. State*, 844 A.2d 311 (Del. 2004).

[131] *Williams*, 805 A.2d at 882.

[132] *Id.* at 881–82.

his time sheets.   If Trial Counsel were successful for Rone, that would not mean Thompson murdered the Connells.  In either case, Trial Counsel would never have been required, as in *Williams*, to take mutually inconsistent legal positions.

Undeterred, Thompson urges that Rone could not beat his charges unless Trial Counsel maintained Rone's *honesty*, whereas Thompson could not win his appeal unless Trial Counsel exposed Rone's *dishonesty*.  A positional conflict does "arise[] when two or more clients have opposing interests in unrelated matters."[133]  But those "opposing interests" must be staked in "the same legal question[.]"[134]

Thompson and Rone's cases did not involve the same legal question.  The legal question presented in Thompson's case was whether he intentionally murdered the Connells.  In contrast, the legal question presented in Rone's case was whether he intentionally stole from DSP.  Given these differences, Counsel could, and did, preserve both interests without sacrificing one.[135]  There was no positional conflict.

### iii.  The Ethical Rules Argument

---

[133] *Id.* at 881.  *Cf.* Del. Laws.' Rules of Prof'l Conduct R. 1.7(b).

[134] *Williams*, 805 A.2d at 881.

[135] *See id.* at 881–82 ("[T]he question is whether the lawyer can effectively argue both sides . . . without compromising the interests of one client or the other.  The lawyer must attempt to strike a balance between the duty to advocate any viable interpretation of the law for one client's benefit versus the other client's right to insist on counsel's fidelity to their legal position.").

Thompson next combines a few professional rules to argue that Trial Counsel could not criticize Rone's credibility on appeal without violating his ethical duties of confidentiality and loyalty. This argument fails for at least three reasons.

First, ethical rules do not govern an ineffective assistance analysis.[136] Second, ethical rules are incorporated into the very actual conflict standard Thompson did not satisfy.[137] And third, Thompson's logic—*i.e.*, Trial Counsel's dual representation alone prevented him from attacking Rone—would prove too much. If simply representing two defendants violated the Sixth Amendment, then all joint and multiple representations would be unconstitutional. That is not the law. "[A] mere theoretical division of loyalties" does not deny the right to counsel.[138] Only conflicts that adversely affect counsel's performance do. As explained, however, Trial Counsel's performance for Thompson was not adversely affected by his duties to Rone.

In this vein, recall that Trial Counsel's representation was, at best, "multiple." Multiple representation might be ill-advised, especially when one client was a

---

[136] *See, e.g.*, *Ploof v. State*, 75 A.3d 840, 852 (Del. 2013) (describing professional conduct regulations as "only guides"); *Lewis*, 757 A.2d at 718 (acknowledging that professional conduct regulations "are not intended to create substantive or procedural rights").

[137] *See Lewis*, 757 A.2d at 718–19 (adopting *Cuyler*'s actual conflict definition, which was engrafted from the ABA, and comparing it favorably against professional conduct regulations).

[138] *Purnell*, 254 A.3d at 1107 (internal quotation marks omitted).

witness against the other in the past. But that does not make it unconstitutional. Multiple representations pose possible conflicts,[139] which are "insufficient to impugn a criminal conviction."[140] Thompson, then, had to "establish that the alternative defense" (here, attacking Rone) "was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests."[141] Here, ballistics evidence was not key to Thompson's convictions. So Counsel's choice to avoid raising issues concerning Rone on appeal was not a "positive act" of favoritism.[142] To the contrary, Trial Counsel's Bey-based arguments were loyal to Thompson.[143] Accordingly, Trial Counsel did not "actually ha[ve] divided loyalties[,]" let alone ones that "adversely affected his . . . performance."[144]

### iv. The Delaware-Is-Different Argument

Finally, Thompson proposes changes in the law. He observes that Delaware law can build above the floor federal law has set. Using this principle, Thompson posits that, because Delaware has a robust body of corporate fiduciary law, and

---

[139] *Cuyler*, 446 U.S. at 348; *Duncan*, 256 F.3d at 197.

[140] *Cuyler*, 446 U.S. at 350.

[141] *Duncan*, 256 F.3d at 197 (internal quotation marks omitted).

[142] *Id.*

[143] *See* Maurer Aff. ¶¶ 7–8 ("[C]ounsel did not challenge the ballistics evidence . . . and, in particular, the testimony presented by [] Rone" because "Counsel did not believe that the evidence was significant insofar as the defense theory was concerned . . . . The Thompson case was on direct appeal and nothing relating to the ballistics evidence was argued or considered as an issue . . . .").

[144] *Purnell*, 254 A.3d at 1105 (internal quotation marks omitted).

because lawyers are fiduciaries, Delaware law has the means to protect defendants from both actual *and* possible conflicts. But even if this reasoning were sound,[145] the Court could not accept it. The Delaware Supreme Court has adopted federal actual conflict standards.[146] The Court cannot overrule the Supreme Court.

Thompson was required to show an actual conflict. He did not. Without an actual conflict, Thompson must show prejudice.[147] He cannot.

## 2. Disregarding Rone on appeal was not prejudicial.

Having "overemphasi[zed] . . . the presumption of prejudice[,]"[148] Thompson does not argue prejudice. To be sure, there is none.

"[I]t is . . . possible to bring [an ineffective assistance] claim based on counsel's failure to raise a particular claim, but it is difficult[.]"[149] That is because "appellate counsel 'need not (and should not) raise every non-frivolous claim[.]'"[150] So a defendant who challenges appellate counsel's failure to raise a particular claim cannot show ineffective assistance unless (i) counsel "omit[ted] issues that are

---

[145] *But see Mickens*, 535 U.S. at 174 (cautioning that reviewing courts cannot "unblinkingly" assume that "all kinds of alleged ethical conflicts[]" are constitutionally problematic (internal quotation marks omitted)).

[146] *E.g.*, *Purnell*, 254 A.3d at 1107–08; *Lewis*, 757 A.2d at 718–19. *See also State v. Xenidis*, 212 A.3d 292, 300–04 (Del. Super. Ct. 2019).

[147] *See, e.g.*, *Hess*, 135 F.3d at 910.

[148] *United States v. Gambino*, 864 F.2d 1064, 1070 (3d Cir. 1988) (internal quotation marks omitted).

[149] *Neal*, 80 A.3d at 946 (alteration and internal quotation marks omitted).

[150] *Id.* (quoting *Smith v. Robbins*, 528 U.S. 259, 288 (2000)).

clearly stronger than those [counsel] presented[;]"[151] and (ii) "but for" counsel's omissions, the defendant "would have prevailed on his appeal."[152]

Here, Rone-based arguments would not have been clearly stronger than Bey-based ones. Without Bey's testimony, the State would not have identified Thompson or adduced any direct evidence of his guilt. Without Rone's testimony, the jury would have learned less about bullets. The State proved Thompson's guilt without Rone and so new evidence that may have generally impeached his character would not have resulted in a new trial or conviction reversal. Accordingly, the Conflict Claims fail for lack of prejudice.

### 3. An evidentiary hearing is unwarranted.

Finally, Thompson requests an evidentiary hearing on the Conflict Claims. But PCR Counsel has already conducted a thorough investigation into the Conflict Claims. Those efforts did not yield or omit anything that would have made Rone's character impeachable at trial. Neither of Rone's reports identified Thompson as the shooter. Because Rone's testimony was not vital to proving the State's case, the credibility of his expert reports is not material.[153] Moreover, Thompson does not

---

[151] *Hudson v. State*, 2020 WL 362784, at *7 (Del. Jan. 21, 2020) (internal quotation marks omitted). *See also Fink v. State*, 2006 WL 659302, at *2 n.7 (Del. Mar. 14, 2006) (rejecting a multi-factor analysis in favor of a "clearly stronger" test).
[152] *Fink*, 2006 WL 659302, at *2.
[153] *See, e.g.*, *Dixon*, 2021 WL 3404223, at *4; *Davenport*, 2019 WL 2513771, at *3.

challenge the credibility or completeness of Trial Counsel's affidavit. So it is not clear what insights Trial Counsel would add to the discussion either.

There is no right to a post-conviction evidentiary hearing.[154] As a result, the Court has "broad discretion"[155] to deny one, especially if a hearing would not change the outcome.[156] Having considered Thompson's motion and the entire record, the Court concludes that an evidentiary hearing is not "desirable"[157] or what "justice dictates."[158] Accordingly, the request for a hearing is denied.

## C. The Vesta Claim fails to state a claim for post-conviction relief.

Turning to the Vesta Claim, Thompson argues that Trial Counsel was ineffective because he failed to conduct better research on the T-Mobile-Metro PCS merger. Had he done so, Thompson says, he would have found U.S. District Court for the District of Oregon opinions implying that Vesta could not be used to pay for Metro PCS in 2013. The Vesta Claim is a traditional ineffective assistance claim subject to the *Strickland* standard. On that standard, a defendant must show "first,

---

[154] *E.g.*, *Getz v. State*, 2013 WL 5656208, at *1 (Del. Oct. 15, 2013).
[155] *Winn v. State*, 2015 WL 1469116, at *2 (Mar. 30, 2015).
[156] *See Hawkins v. State*, 2003 WL 22957025, at *1 (Del. Dec. 10, 2003) ("It is well-settled that the Superior Court is not required to conduct an evidentiary hearing upon a Rule 61 motion if, on the face of the motion, it appears that the petitioner is not entitled to relief."); *Owens*, 2021 WL 6058520, at *15 ("An evidentiary hearing is not empty ritual[]" or "an opportunity . . . to address issues that are not material to a favorable determination of the defendant's claims.").
[157] Del. Super. Ct. Crim. R. 61(h)(1).
[158] *Id.* R. 61(h)(3).

that his counsel's representation fell below an objective standard of reasonableness and, second, that the deficiencies in counsel's representation caused him substantial prejudice."[159]  Proving both deficient performance and prejudice is a "formidable obstacle[.]"[160]  Thompson cannot clear it.

### 1. Counsel did not perform deficiently.

As to the performance prong, the Vesta Claim must overcome "a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance."[161]  So Thompson must establish that "no reasonable lawyer would have conducted the defense as [Trial Counsel] did."[162]  He cannot.

To begin, Trial Counsel's approach to excluding the Vesta evidence was reasonable.  The State sought to prove that Thompson owned the Kenny AAAA phone by introducing evidence suggesting that his T-Mobile payments were actually Metro PCS payments.  In doing so, the State called a T-Mobile records custodian to testify that the carriers merged in 2013 and Metro PCS survived as a T-Mobile affiliate.  Trial Counsel objected, arguing that the records custodian was not competent to opine on whether or when a merger occurred.  Indeed, he observed that Thompson's payment records themselves belied the existence of a merger.  Looking

---

[159] *Green*, 238 A.3d at 174 (citing *Strickland*, 466 U.S. at 687–88).
[160] *Id.*
[161] *Id.* (internal quotation marks omitted).
[162] *Id.* (internal quotation marks omitted).

40

to Trial Counsel's decision, rather than the outcome,[163] it cannot be said that no reasonable defense lawyer would have used the State's own proffer against it to support exclusion of evidence tending to identify the lawyer's client at the scene of a double homicide.

Moreover, Trial Counsel extracted a crucial fact on cross-examination: the Kenny AAAA phone was deactivated in 2013. This fact was consistent with others, *e.g.*, that Thompson (i) had a different phone; (ii) had been paying T-Mobile, not Metro PCS, in 2013; and (iii) did not pay Metro PCS until 2014. Using these facts, Trial Counsel argued in summation that the State's evidence did not establish that Thompson was paying for the Kenny AAAA Phone in 2013. Contextualized, Trial Counsel tried to create reasonable doubt as to Thompson's whereabouts on the night of the murders. Looking to Trial Counsel's decision, rather than the outcome, it cannot be said that no reasonable defense lawyer would have argued his client was not present at a shooting if the prosecution hinged on placing his client where the victims were shot.

---

[163] *See, e.g.*, *Neal*, 80 A.3d at 942 ("Because it is all too easy for a court examining counsel's defense after it has proved unsuccessful to succumb to the distorting effects of hindsight, counsel's actions are afforded a strong presumption of reasonableness . . . . [A reviewing court's] task is to reconstruct the circumstances of counsel's challenged conduct, and to *evaluate the conduct from the counsel's perspective at the time*." (alteration and internal quotation marks omitted)).

To be sure, Trial Counsel's tactics were not the only possible ones. But the ineffective assistance standard does not require a defense lawyer to be perfect.[164] It requires only that the lawyer's strategies be reasonable.[165] Here, the upshot of Trial Counsel's objection was the same as what Thompson now alleges: Thompson's 2013 Vesta payments could not have been made to Metro PCS. By advancing the same argument, Thompson has all but conceded Trial Counsel's reasonableness.

### 2. Any error did not prejudice the outcome.

Even assuming Trial Counsel performed deficiently, Thompson still must establish prejudice: "a reasonable probability that, but for counsel's professional errors, the result of the proceeding would have been different."[166] "A reasonable probability means a probability sufficient to undermine confidence in the outcome .

---

[164] *E.g.*, *Harrington v. Richter*, 562 U.S. 86, 110 (2011) ("[T]here is no expectation that competent counsel will be a flawless strategist or tactician[.]"); *Burns v. State*, 76 A.3d 780, 788 (Del. 2013) ("[E]ven evidence of isolated poor strategy, inexperience, or bad tactics does not necessarily amount to ineffective assistance of counsel." (alterations and internal quotation marks omitted)); *see also United States v. Hasting*, 461 U.S. 499, 508–09 (1983) ("[T]aking into account the human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and . . . the Constitution does not guarantee [one].").

[165] *E.g.*, *Strickland*, 466 U.S at 689 (observing that there are "countless ways" an attorney can provide ineffective assistance and that defense counsel enjoys a "range of legitimate decisions regarding how best to represent a criminal defendant").

[166] *Swan v. State*, 248 A.3d 839, 859 (Del. 2021) (internal quotation marks omitted). *See Albury v. State*, 551 A.2d 53, 60 (Del. 1988) ("[I]neffectiveness claims alleging a deficiency in . . . performance are subject to a general requirement that the defendant *affirmatively prove prejudice*." (internal quotation marks omitted)).

. . ."[167] And "[t]he likelihood of a different result must be substantial[,] not just conceivable."[168] Failure to state prejudice with particularity is "fatal[.]"[169] Accordingly, Thompson "must make concrete allegations of actual prejudice and substantiate them[.]"[170]

The Vesta evidence was not the only evidence that tended to identify Thompson. Nor was it the best. Bey testified that Thompson killed the Connells. A rational juror could have found that Bey's testimony alone was sufficient evidence of Thompson's guilt. Even so, Thompson's presence at the scene was corroborated by (i) CSLI; (ii) call records showing that the Kenny AAAA phone called Benson before the murders; (iii) call records showing that the Kenny AAAA phone was contacted by Thompson's girlfriend immediately after the murders; and (iv) the fact that Thompson was working near the Paladin Club when the murders occurred. Against all this, Thompson had to show with particularity a substantial probability that, but for Trial Counsel's failure to further undermine the Vesta evidence, Thompson would have been acquitted. He did not. Thompson suffered no prejudice.

In sum, Thompson failed to show that Counsel performed deficiently and that his errors prejudiced Thompson's defense. Accordingly, the Vesta Claim fails.

---

[167] *Green*, 238 A.3d at 174 (internal quotation marks omitted).
[168] *Swan*, 248 A.3d at 859 (internal quotation marks omitted).
[169] *Purnell v. State*, 106 A.3d 337, 342 (Del. 2014) (internal quotation marks omitted).
[170] *Dawson v. State*, 673 A.2d 1186, 1196 (Del. 1996).

### 3. The Oregon cases do not support the Vesta Claim.

Thompson's Oregon caselaw reinforces these conclusions. For one thing, an Oregon federal court does not bind a Delaware state court. Counsel had to support his objection with the Delaware Rules of Evidence and Delaware cases interpreting them. The evidentiary question presented at the hearing was not novel or complex and so it was reasonable for Trial Counsel to decline a cross-country research tour for extra-jurisdictional authority.[171]

For another, one of Thompson's cases observed that T-Mobile and Metro PCS *did* merge in 2013, with Metro PCS surviving to its own market share.[172] So even if, as Thompson insists, Vesta and Metro PCS had a contentious business

---

[171] *See Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986) (explaining that defense counsel is not ineffective for "mak[ing] a reasonable decision that makes particular investigations unnecessary" (internal quotation marks omitted)). *See also Harrington*, 562 U.S. at 110 ("[A]n attorney may not be faulted for a reasonable miscalculation . . . or for failing to prepare for what appear to be remote possibilities."); *Glenn v. Wynder*, 743 F.3d 402, 407 (3d Cir. 2014) ("In order to satisfy due process, [a defendant's] trial must have been fair; it need not have been perfect."); *Khan v. Capra*, 2020 WL 6581855, at *5 (S.D.N.Y. Nov. 10, 2020) ("A defendant is entitled to a competent lawyer, not an omniscient one." (internal quotation marks omitted)); *Nelson v. United States*, 406 F. Supp. 2d 73, 75 (D.D.C. 2005) ("The constitution does not guarantee the right to clairvoyant counsel."); *State v. Zebroski*, 2001 WL 1079010, at *2 (Del. Super. Ct. Aug. 31, 2001) ("An ineffective assistance claim" does not invite "speculation about what trial counsel could have done better."). *See generally Strickland*, 466 U.S. at 698 ("The object of an ineffective assistance claim is not to grade counsel's performance.").

[172] *See Vesta Corp. v. Amdocs Mgmt. Ltd.*, 129 F. Supp. 3d 1012, 1028 (D. Or. 2015).

arrangement, the Oregon caselaw still would have strengthened the State's fundamental point: T-Mobile controlled Metro PCS in 2013.

At most, Counsel would have gleaned from the Oregon cases technical or historical knowledge about Vesta's interactions with the companies. The "conceivable" influence of those details, however, would not have been enough to convince the Court that the evidentiary issue went any less to weight or the jury that Thompson was any less guilty.[173] So the Oregon cases were not substantially likely to change an outcome either. Trial Counsel's failure to cite them was neither unreasonable nor prejudicial.

## D. The Commerce Street Claim fails to state a claim for post-conviction relief.

Finally, the Court turns to the Commerce Street Claim. Recall that the murders occurred in 2013. Thompson's trial was held in 2017. The State asked Thompson's supervisor for the address of Leonard's Trucking. The State did not ask for Leonard's "2013" address. So the supervisor answered in the present tense. Thompson now claims Trial Counsel ineffectively failed to object because that answer misled the jury into thinking Leonard's owned the 20 Commerce Street lot in 2013, even though it allegedly did not own the 20 Commerce Street lot until 2014.

---

[173] *Swan*, 248 A.3d at 859 (internal quotation marks omitted).

Since the Commerce Street Claim fails for lack of prejudice, the Court will assume for analytical purposes that Trial Counsel performed deficiently.[174]

Bey testified that Thompson killed the Connells. CSLI corroborated Bey's testimony. The FBI agent explained that cell towers captured Thompson within a seven-minute driving distance from the Paladin Club both before and after the murders. Testimony confirmed that the 20 Commerce Street lot was mapped within that vicinity. CSLI freezes the target within a triangulated zone; it does not snap a street-level picture.[175] So whether Thompson was physically "at Leonard's," or simply in the same neighborhood, did not matter. CSLI showed that Thompson was close enough to the Paladin Club to ambush a couple as they came home from dinner and then get away quickly. Given that reality, it is difficult to imagine that the jury ascribed case-dispositive importance to whether Thompson was seven minutes away or seven minutes away and at Leonard's. Either way, he was in the area.

True, the State may have gained something from matching CSLI with Thompson's supervisor's testimony. But any marginal advantage to the State was

---

[174] *See Strickland*, 466 U.S. at 698 ("If it is easier to dispose of an ineffective assistance claim on the ground of lack of sufficient prejudice . . . that course should be followed."); *see also Ruffin v. State*, 2019 WL 719038, at *2 (Del. Feb. 19, 2019) ("[T]here is no need to analyze whether an attorney performed deficiently if the alleged deficiency did not prejudice the movant.").

[175] *See generally Cell Phone Location Tracking*, Nat'l Assoc. of Crim. Def. Laws., https://www.nacdl.org/Document/2016-06-07_CellTrackingPrimer_Final(v2)(2) (last visited May 22, 2022).

not a disadvantage to Thompson. Trial Counsel portrayed Thompson as a hard worker who walked the straight-and-narrow path and did not need extra money from a murder-for-hire scheme. By telling the jury Thompson was "at Leonard's," the State also told the jury that Thompson was "at work." This bolstered the defense.[176]

Given all the other evidence, any failure by Trial Counsel to audit Leonard's 2013 property portfolio would not undermine the Court's confidence in the verdict. Even if the jury thought Thompson was at work, it still had to determine whether he was the shooter. Bey said Thompson was the shooter and other evidence corroborated Bey's testimony. A copy of Leonard's 2014 lease would not have shortened Thompson's proximity to the scene, or spoken to his intent or motivation, in 2013. Accordingly, the Commerce Street Claim fails for lack of prejudice.

## CONCLUSION

Thompson failed to demonstrate that Trial Counsel had an actual conflict of interest or otherwise represented him ineffectively. Accordingly, his Rule 61 motion is **DENIED**.

**IT IS SO ORDERED**.

---

[176] Trial Counsel understood this, Maurer Aff ¶ 11 (describing the "at work" issue as "strategic"), and the law gave him the discretion, exercised non-prejudicially here, to let the issue go, *see, e.g.*, *Taylor v. State*, 32 A.3d 374, 385–88 (Del. 2011) (reviewing failure to object claims for prejudice under *Strickland* standard).

Charles E. Butler, Resident Judge