IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| AARON THOMPSON, | § | |
| | § | No.   454, 2017 |
| Defendant Below, | § | |
| Appellant, | § | Court Below:   Superior Court of |
| | § | the State of Delaware |
| v. | § | |
| | § | I.D. No. 1602016732 (N) |
| STATE OF DELAWARE, | § | |
| | § | |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted:   December 12, 2018
Decided:   February 21, 2019

Before **STRINE**, Chief Justice; **VALIHURA** and **VAUGHN**, Justices.

Upon appeal from the Superior Court.   **AFFIRMED**.

Elise K. Wolpert, Esquire (*Argued*), and Eugene J. Maurer, Jr., Esquire, Eugene J. Maurer, Jr., P.A., Wilmington, Delaware, for Appellant, Aaron Thompson.

Maria T. Knoll, Esquire, Deputy Attorney General, Wilmington, Delaware, for Appellee, State of Delaware.

**VAUGHN**, Justice:

## I.  INTRODUCTION

Appellant, Aaron Thompson, appeals from a Superior Court jury verdict finding him guilty of two counts of Murder in the First Degree, two counts of Possession of a Firearm During the Commission of a Felony, and Conspiracy in the First Degree.  The charges arose from the double homicide of Joseph and Olga Connell, who were shot to death on September 22, 2013.  The State's theory of the case at trial was that Mr. Connell's business partner, Chris Rivers, paid to have the Connells killed so he could collect on an insurance policy listing Mr. Connell as the insured and Rivers as the beneficiary.  The theory was that Rivers paid Joshua Bey, who in turn hired Dominique Benson and Thompson to carry out the murders.  The success of the State's theory at Thompson's trial largely depended on the testimony and credibility of Bey.  Thompson contended throughout the trial that Bey was lying and made up the connection with Thompson to get himself a favorable plea deal.

Thompson makes two claims on appeal.  First, he contends that two statements by the State during its rebuttal argument constituted prosecutorial misconduct that undermined the fairness of the trial.  According to Thompson, the first statement in question was one in which the State argued facts that were not supported by record.  The second statement, he argues, was one that improperly appealed to the jury's emotion.  Second, he contends that the trial court abused its

1

discretion in allowing Bey's recorded statement to the police to be played for the jury following his testimony, arguing that this was inadmissible hearsay not subject to an exception.

We find that the Superior Court should be affirmed on both claims. First, we conclude that the two statements made by the State during its rebuttal do not rise to the level of prosecutorial misconduct. Second, we conclude that Bey's recorded statement to the police was admissible under Delaware Rule of Evidence 106, the rule of completeness.

## II. FACTS AND PROCEDURAL HISTORY

Rivers and Mr. Connell were joint owners of C&S Automotive Repair. In October 2012, Rivers and Mr. Connell secured a nearly one million–dollar mortgage in connection with their business. As part of that transaction, they were both required to purchase life insurance in the amount of $977,500, with the other partner named as the beneficiary, so that the surviving partner could pay off the mortgage if one of them were to die.

At approximately 1:30 a.m., on September 22, 2013, New Castle County police officers responded to a reported shooting at the Connells' residence in Wilmington. The officers discovered that the Connells had been shot and killed. After an extensive investigation, the police arrested Rivers and charged him with their murders.

Early on in the investigation, on October 4, 2013, Bey was questioned by Detective James Leonard because Rivers's phone records revealed that, around the time of the murders, he had deleted certain communications with a phone number associated with Bey's girlfriend. Initially, Bey declined knowing anyone by the name of Chris Rivers, but after the detective confronted him with Rivers's phone records, Bey admitted that Rivers was his mechanic. During the questioning, it became apparent that Bey was not telling the entire truth with regard to his contact with Rivers around the time of the murders. As for his location on the night of the murders, Bey stated that he worked an overnight shift at a department store (from approximately 10:00 p.m. to 6:00 a.m.). His timesheet and video surveillance of the parking lot corroborated Bey's statement that he was at work at the time of the murders.

Detective Leonard questioned Bey again on October 24, 2013, and this time Bey admitted he was Rivers's drug dealer. The next day, Bey was arrested for providing a false statement to the police. This arrest violated the terms of a probationary term he was serving and led to a violation of probation proceeding against him.

After almost ten months of incarceration, while awaiting trial on the charge of providing a false statement to the police, and moments before trial was to start, Bey agreed to provide information about the murders in exchange for a deal from the

3

State. On August 14, 2014, Bey gave a proffer that implicated not only himself, but also Rivers and Benson (the "August 14 proffer"). At that time, however, Bey declined to enter into an agreement with the State.

Bey was arrested for the Connells' murders the following month. He then agreed to cooperate. In exchange for his cooperation, the State made a plea offer involving a plea of guilty to Conspiracy in the First Degree and a finding that he had violated his probation. On September 5, 2014, after becoming a cooperating witness, Bey provided his fourth and final statement to the police (the "September 5 statement").

At Thompson's trial, Bey testified for the State, and his testimony provided the main narrative of the Connells' murders. He explained that shortly after meeting Rivers in 2012, he started selling him prescription pills and cocaine and that in 2013, Rivers asked him to hire someone to kill the Connells. Bey and Rivers negotiated over the price, eventually settling on $60,000. Rivers agreed and arranged to pay half up front and the other half in installments. Bey told Rivers that he needed $5,000 immediately, which Rivers paid in cash.

Bey testified that he hoped to make money from this transaction by hiring someone else to do the murders for less. Bey asked Benson to do it and brought him to C&S to see the shop and meet Rivers. After learning from Rivers that Bey had lied to him about how much Rivers was willing to spend (so that he could keep

4

the extra for himself), Benson nonetheless agreed to find someone else to do it for them. As the planning progressed, Bey was under the impression that Benson would commit the murders, but at some point, Benson told Bey that he would ask Thompson to assist him.

Bey further testified that Benson's cousin, Willis Rollins, was also asked to carry out their plan. Benson arranged for Bey and Rollins to meet at a restaurant near the Connells' residence so that Bey could show Rollins where the Connells lived. Bey testified that Thompson arrived at the restaurant and handed Rollins a gun with a silencer. After showing Rollins the path to take to get to the Connells' residence, Bey went back to his car and waited for Rivers to provide updates as to their location. The next day, Bey called Benson to ask what happened. Benson stated that Rollins "froze up" and did not go through with the plan.[1]

Bey then testified about a second attempt to kill the Connells. Benson told Bey, who in turn told Rivers, that they were having trouble finding a car to use. Rivers offered to let them drive his truck, a Chevrolet Tahoe, so Bey picked it up at C&S and then met Benson and Thompson in a parking lot behind his mother's house. Bey testified that Benson and Thompson got into the car and drove off. But the Connells were not killed this time either. Bey explained that because Rivers's car was equipped with On Star, Thompson was concerned about driving it.

---

[1] App. to Appellant's Opening Br. at A170.

On September 22, 2013, the night of the murders, shortly before beginning his overnight shift at the department store, Bey learned from Rivers that the Connells would be returning home from dinner in about thirty minutes. Bey relayed this information to Benson. Bey did not speak to Benson again until after his shift ended the next morning. When Bey first called Benson the next morning to ask what happened, Benson said he needed to call Thompson to find out. A few hours later, Bey received a call from Benson saying that it was official and to "go collect."[2]

Apart from the initial $5,000 payment, Bey did not receive any other money prior to the murders. After the murders, Rivers eventually paid another $5,000 to Bey on September 26. Bey testified that after he received the money from Rivers, he "called up Dom [Benson]" and then met with Benson, who was accompanied by Rollins, at a park near Benson's house to give Benson this $5,000 payment.[3] According to Bey, Benson refused the payment. Later that day, Bey received a phone call from Benson instructing him to meet with Thompson. Bey went to Thompson's house and gave him the $5,000 and explained that Rivers would be receiving more money from an insurance payout.

On cross-examination, Thompson confronted Bey with several statements from his prior statements to the police that were inconsistent with his testimony at

[2] *Id.* at A174.
[3] *Id.* at A175, A175-76.

6

trial. A substantial portion of Bey's cross-examination involved Thompson's counsel confronting Bey with several statements he made in the August 14 proffer that were inconsistent with his trial testimony. He also questioned Bey about two discrete points in the September 5 statement that were inconsistent with his trial testimony.

Before beginning its redirect, the State announced that it intended to play Bey's September 5 statement for the jury as a prior consistent statement under Delaware Rule of Evidence 801(d)(1)(B) to rehabilitate his credibility.[4] Thompson objected, arguing that this exception did not apply because Bey's motive to lie existed prior to the September 5 statement. The trial court heard arguments about this issue following Bey's cross-examination. The State explained that it intended to play the September 5 statement, and not the August 14 proffer, because it had higher quality audio. Thompson admitted that the August 14 proffer and the September 5 statement were largely consistent with each other, but he maintained that both were made after Thompson's motive to lie arose. And although the trial court asked whether the September 5 statement was independently admissible under

---

[4] At the time of trial, Rule 801(d)(1)(B) provided that a statement is not hearsay if the declarant testifies at trial and is subject to cross-examination about the statement and the statement is "consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive." This rule was amended, effective January 1, 2018, such that this exception applies only in civil cases. *See* D.R.E. 801(d)(1)(B). The rule now provides that for criminal cases, the admissibility of prior consistent statements is governed by 11 *Del. C.* § 3507. *See id.* 801(d)(1)(C).

either 11 *Del. C.* § 3507 or Delaware Rule of Evidence 106, the parties focused their arguments on Rule 801(d)(1)(B).

The morning after the hearing, the trial court ruled from the bench that the September 5 statement was admissible under both Rule 801(d)(1)(B) and 11 *Del. C.* § 3507. The trial court explained that Thompson attacked Bey's credibility by showing that his motives were improper—"they were to get a deal, to save himself, and to curry whatever favor he had in order to minimize his own legal difficulties"—and, therefore, found that Bey's prior consistent statement, offered to rehabilitate his credibility, "fit squarely within Rule 801(d)(1)(B)."[5] As to § 3507, the court explained that because Thompson cross-examined Bey about the statement, the prior statement was admissible under that statute. In light of this ruling, Thompson agreed to allow the State to introduce the September 5 statement through Detective Leonard. After Detective Leonard set the foundation for the statement, it was played in its entirety for the jury.

In addition to Bey's (and other witnesses') testimony, the State presented phone records and cellular location information that generally was consistent with, and circumstantially corroborated, Bey's testimony. The State presented phone records of all persons involved in the murders. Some of this evidence, at least on its face, contradicted certain portions of Bey's testimony. Of particular concern

---

[5] App. to Appellant's Opening Br. at A207-08.

8

was Bey's testimony as to whom he called a few days after the murders. Bey testified that on September 26, he called Benson and then met with Benson, who was accompanied by Rollins, at a park near Benson's house. The phone records, however, showed that there were multiple phone calls between Rollins's phone and Bey's phone that day, but none between Bey's and Benson's. The State presented evidence that Benson and his girlfriend shared a phone and that during the day she typically took that phone with her to work, meaning Benson ordinarily did not have access to the phone during the daytime.

Ultimately, the jury found Thompson guilty of all charges. He was sentenced to two natural life sentences plus forty-five years at Level V incarceration. This is Thompson's direct appeal.

### III. DISCUSSION

Thompson's first claim is that two separate incidents of prosecutorial misconduct occurred during the State's rebuttal argument and that this misconduct prejudiced him and compromised the integrity of the trial.

The standard of review for claims of prosecutorial misconduct depends on whether the issue was fairly presented below.[6] "If defense counsel raised a timely and pertinent objection to prosecutorial misconduct at trial, or if the trial judge intervened and considered the issue *sua sponte*, we essentially review for harmless

---

[6] *Baker v. State*, 906 A.2d 139, 148 (Del. 2006) (en banc).

error."[7] If, on the other hand, defense counsel failed to object and the trial judge did not intervene *sua sponte*, "we review only for plain error."[8] Regardless of the standard of review, however, we must first conduct a *de novo* review to determine whether misconduct actually occurred.[9] If no misconduct occurred, then the analysis ends under either standard.[10]

In Thompson's closing argument, he argued that Bey's testimony was false and that Bey had made up his entire story. In its rebuttal, the State argued, among other things, that, based on Bey's testimony and the evidence indicating that Benson did not have access to his phone during the daytime, Benson must have been communicating with Bey using Rollins's phone. Thompson objected to this as beyond the scope of the closing argument his counsel had made. The Superior Court overruled the objection. On appeal, Thompson contends that the State improperly argued facts that were not supported by the evidence when it "suggested that Bey was actually speaking to Benson when he called Rollins on September 26, 2013—the day on which Bey attempted to give Benson a partial $5,000 payment."[11]

We find that the State's argument concerning Bey's phone calls was supported by the record and, therefore, no misconduct occurred. The State argued that Bey's

---

[7] *Id.* (internal quotation marks omitted).
[8] *Id.*
[9] *Id.* at 148, 150.
[10] *Id.*
[11] Appellant's Opening Br. at 20.

testimony, that he called Benson on September 26, 2013, was consistent with the phone records even though the records indicated that Bey actually called Rollins's phone on that day. Bey testified at trial that on September 26, he "called up Dom [Benson]" and that he met with Benson, who was accompanied by Rollins, at a park near Benson's house.[12] That testimony alone supports the State's argument. However, there was also testimony at trial that established that Benson's girlfriend worked during the day and that when she worked she took their phone (that is, Benson's phone for the purposes of the phone records) to work with her. Thus, record evidence supported the reasonable inference that Benson likely did not have access to his phone at this time (because it would have been with his girlfriend) and that, as a substitute, Benson would use Rollins's phone to contact Bey because he was with Rollins at that time. Because the State's argument was a reasonable inference supported by the record, it cannot and did not constitute misconduct.

In his closing argument, Thompson's counsel also tried to impugn Bey's motive for testifying against Thompson by suggesting that Bey was getting a sweetheart deal in exchange for his testimony. The second statement that Thompson complained of arose in that context. During the State's rebuttal argument, the prosecutor said: "He [Bey] is a flipped co-defendant. He is a snitch. He is a rat. All of those things. He will serve eight-and-a-half years in prison,

---

[12] App. to Appellant's Opening Br. at A175, A175-76.

and then he will get out. And what will happen to him then?"[13] Thompson objected and said he would address the objection later. The court responded, saying "[l]et her finish her point."[14] The prosecutor then moved on to another topic. After the State completed is rebuttal, Thompson's counsel renewed the objection and asked for a mistrial, arguing that the prosecutor's statement created a clear and prejudicial inference that Bey would be at risk of personal danger upon his release from prison. The State argued that Bey would experience other adverse circumstances upon his release from prison and that to "the extent it causes a problem," the court should give a curative instruction informing the jury to disregard the statement.[15] The court denied the request for a mistrial and Thompson's counsel declined a curative instruction. We find that the trial court's denial of Thompson's request for a mistrial was not error. We agree with the State that the statement was ambiguous and did not rise to the level of prosecutorial misconduct. Rather than being an attempt to evoke sympathy, the more plausible explanation was that the State was trying to rebut the defense's continual attacks on Bey's credibility and suggestion that he was getting a good deal in exchange for his testimony. In essence, the State was pointing out that Bey's decision to testify was a double-edged sword: Although he got a shorter prison sentence, he also risked being labeled a

---

[13] *Id.* at A306.
[14] *Id.*
[15] *Id.* at A308.

12

snitch.    And even if the statement is viewed as improper, it did not cause prejudice to Thompson sufficient to justify the granting of a mistrial.

Thompson's second claim on appeal involves an issue of admissibility of evidence, which we review under the abuse of discretion standard.[16]    "An abuse of discretion occurs when a court has exceeded the bounds of reason in light of the circumstances, or so ignored recognized rules of law or practice so as to produce injustice."[17]    The Superior Court found that Bey's September 5 statement, played to the jury following Bey's testimony, was admissible under both Delaware Rule of Evidence 801(d)(1)(B) and 11 *Del. C.* § 3507.    Although the court asked the parties about the applicability of Rule 106, it did not expressly base its ultimate decision on that rule.    For the following reasons, we find that the entirety of Bey's September 5 statement was admissible under Rule 106 to put into context the various inconsistent statements brought out by Thompson on cross-examination.

Rule 106 codifies the common-law rule of completeness, and its purpose is "to prevent misleading impressions which often result from taking matters out of context."[18]    In certain circumstances, Rule 106 can render otherwise inadmissible evidence, such as hearsay, admissible.[19]    It states, "If a party introduces all or part

---

[16] *McNair v. State*, 990 A.2d 398, 401 (Del. 2010).

[17] *Id.*

[18] *Flamer v. State*, 953 A.2d 130, 135 (Del. 2008) (internal quotation marks omitted).

[19] *United States v. Sutton*, 801 F.2d 1346, 1368 (D.C. Cir. 1986).   Although in *Banther v. State*, 823 A.2d 467, 487 (Del. 2003) (en banc), we stated that "D.R.E. 106 does not make otherwise

13

of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time."[20]   Importantly, Rule 106 "applies to an oral quotation from a part of a document," and "the offer of the document itself, in whole or in part, is unnecessary to the application of the Rule."[21]   Therefore, when Thompson questioned Bey about specific parts of the September 5 statement by quoting portions of his statement, Thompson "introduce[d]" part of the September 5 statement for purposes of Rule 106.[22]

"Once a party introduces a portion of a recording or writing, the burden shifts to the other party to require the admission of all or part of the remainder of the recording or writing which ought in fairness be considered contemporaneously with

---

inadmissible evidence admissible," that was in the context of evidence being inadmissible under Rule 403, which trumps all other evidence rules.  The rule against hearsay, Rule 802, says, "Hearsay is not admissible except as provided by law or by these Rules."  Thus, Rule 106, as part of "these Rules," can authorize the admission of hearsay in certain circumstances. *See Sutton*, 801 F.2d at 1368 (interpreting the analogous federal rule and explaining that "every major rule of exclusion in the Federal Rules of Evidence contains the proviso, 'except as otherwise provided by these rules,' which indicates 'that the draftsmen knew of the need to provide for relationships between rules and were familiar with a technique for doing this,'" and "[t]here is no such proviso in Rule 106, which indicates that Rule 106 should not be so restrictively construed" (footnote omitted) (first quoting Fed. R. Evid. 402, 501, 602, 613(b), 704, 802, 806, 901(b)(1), 1002; and then quoting C. Wright & K. Graham, *Federal Practice and Procedure: Evidence* § 5078, at 376 (1977 & 1986 Supp.))).  Moreover, for a prior case illustrating the law covered by the Delaware rule, the Editors' Notes for Rule 106 cite to *Lowber v. State*, 100 A. 322, 324 (Del. 1917), where this Court held that what would have been hearsay under the modern rules should have been admitted at trial so that the whole statement could have been considered.

[20] D.R.E. 106.
[21] *Burke v. State*, 484 A.2d 490, 497 (Del. 1984).
[22] *See id.*

14

it."[23]   Rule 106 is further circumscribed by two qualifications: "The portions sought to be admitted (1) must be relevant to the issues and (2) only those parts which qualify or explain the subject matter of the portion offered by the opponent need be admitted."[24]

Where, as here, the cross-examiner's goal is to impeach the credibility of the testifying witness by arguing that the witness's whole story is made up and does this by bringing up isolated examples of inconsistencies with a prior statement that are insignificant to the whole story, it is appropriate under Rule 106 for the jury to hear the entire prior statement to properly assess the witness's credibility.   Thompson's line of attack was that since Bey could not keep his story straight (or consistent), he must have made the whole thing up.   The recorded statement, however, was largely consistent with Bey's trial testimony.   Therefore, playing the entire statement countered Thompson's argument that Bey was making everything up.

For these reasons, and because the State sought to play only one of Thompson's recorded statements, we do not think that there was any impermissible bolstering of the witness or needless presentation of cumulative evidence. Although Rule 106 does not always require the admission of an entire recorded

---

[23] *Flamer*, 953 A.2d at 135 (internal quotation marks omitted).
[24] *Id.* (internal quotation marks omitted).

15

statement, the Superior Court did not abuse its discretion in admitting the entirety of the September 5 statement.

Since we find that Bey's September 5 statement was admissible under Rule 106, we need not consider its admissibility under Rule 801(d)(1)(B) or § 3507.

## IV.   CONCLUSION

For the foregoing reasons, the Superior Court is affirmed.