IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| AARON THOMPSON, | § | |
| | § | No. 220, 2022 |
| Defendant Below, | § | |
| Appellant, | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | Cr. ID No. 1602016732(N) |
| STATE OF DELAWARE | § | |
| | § | |
| Appellee. | § | |

Submitted: March 8, 2023
Decided: April 18, 2023

Before **SEITZ**, Chief Justice; **VALIHURA** and **VAUGHN**, Justices.

Upon appeal from the Superior Court. **AFFIRMED**.

John P. Deckers, Esquire, LAW OFFICE OF JOHN P. DECKERS, P.A., Wilmington, Delaware, *for Defendant Below, Appellant Aaron Thompson*.

Matthew C. Bloom, Esquire, DELAWARE DEPARTMENT OF JUSTICE, Wilmington, Delaware, *for Appellee State of Delaware*.

**SEITZ**, Chief Justice:

A Superior Court jury convicted Aaron Thompson of multiple crimes for his role in the 2013 double murder of Joe and Olga Connell. We affirmed his convictions on direct appeal. Thompson moved for postconviction relief under Superior Court Criminal Rule 61. The Superior Court denied his motion. The court found that Thompson's trial counsel was not constitutionally ineffective for failing to investigate the connection between Thompson and a property near the crime scene at the time of the killings. The court also held that trial and appellate counsel did not have a conflict of interest when he represented the State's ballistics expert in an unrelated criminal proceeding during Thompson's direct appeal. Thompson has appealed from the Superior Court's denial of his motion for postconviction relief. For the reasons set forth below, we affirm the Superior Court's judgment.

I.

A.

We briefly summarize the facts from Thompson's direct appeal.[1] Christopher Rivers and Joe Connell ran an auto repair shop. Each had taken out a $1 million life insurance policy on the other. Rivers solicited Joshua Bey, a customer who occasionally sold drugs to him, to kill Joe Connell and his wife. Bey contacted a third person, Dominque Benson, to carry out the murder. Benson in turn reached

---

[1] *Thompson v. State*, 205 A.3d 827, 832 (Del. 2019).

out to Aaron Thompson to assist him. The double murder took place in the early morning hours of September 22, 2013, in front of the Connells' Paladin Club condominium in Wilmington as they returned home from dinner.

During the murder investigation, the police arrested Bey for making false statements about his connection with Rivers. At the time, Bey had multiple felony convictions and was on probation, which meant his arrest triggered a violation of his probation charge. Before his trial, Bey agreed to provide the State with information about the killings. He implicated Rivers, Benson, and Thompson in the murders. Bey eventually pleaded guilty to first-degree conspiracy and admitted to a probation violation in exchange for the State dropping other charges. His plea deal allowed him to avoid being declared an habitual offender and a possible life sentence.

In 2016, the State tried Rivers and Benson for the double murders. Rivers was convicted on all counts, but Benson was acquitted on all charges except first-degree conspiracy.

B.

Thompson's trial followed in 2017. The State charged him with two counts of first-degree murder, two counts of possession of a firearm during the commission of a felony, and one count of first-degree conspiracy. Bey testified at Thompson's trial and provided details about how the murder conspiracy came to be, the prior failed attempts to carry out the murders, and then the actual murders. The Superior

3

Court found that "Bey's testimony played a pivotal role" in the trial.[2]  The court explained that, due to Bey's status as "a turncoat who accepted a plea offer in exchange for incriminating his co-conspirators," the State focused "on shoring up Bey's credibility" in several ways.[3]

First, the State used cell-site location information ("CSLI") to show how cell phones associated with Thompson moved to different locations.  The data placed him in the vicinity of the crime scene on the night of the murders and corroborated Bey's testimony.  One phone was Thompson's cell phone, and the other was a disposable phone referred to as the "Kenny AAAA phone."[4]  The State sought to connect the Kenny AAAA phone to Thompson using payment records to purchase minutes.  CSLI evidence using call records showed that Thompson's cell phone and the Kenny AAAA phone moved in unison repeatedly between the area of the crime scene and a nearby area of Wilmington.[5]  The back and forth between the two locations in the leadup to the murders also matched Bey's description of events as

---

[2] *Thompson*, 2022 WL 1744242, at *2.

[3] *Id.*

[4] *Id.*

[5] *See* App. to Answering Br. at B148–61; *see also id.* at B156 ("[B]oth phones are in the same geographical location at 9:21 p.m, and they overlap right in the vicinity of the crime scene. . . . And we can see that the cell sites overlap in that geographical location, again, they're moving in the same direction, moving and staying in the same location throughout the evening."); *id.* at B157 ("[N]ow the phone moves away from the crime scene and then comes back into the area of where it was earlier in the evening . . . .  And so the phones are back in that sort of overlap of where they were before . . . ."); *id.* at B158 ("We see again the phones are in the same geographical area that they started in.  They went over to the vicinity of the crime scene and now have both come back to that same geographical area coincidentally.").

Thompson had missed the first attempt to kill the Connells earlier that night and was forced to try again when the couple returned home from dinner.[6]

The timing was also important as the final call before the murders was from the Kenny AAAA phone at around 11:45 p.m. near the location of the crime scene.[7] After a period without any calls from either phone, the police received a call reporting the murders at around 1:28 a.m.[8] Then, at 1:41 a.m., thirteen minutes after the first call to the police reporting the murders, a call was made to Thompson's girlfriend from the same nearby area of Wilmington using the Kenny AAAA phone.[9] The Superior Court described the CSLI as "incriminating."[10]

Second, the State and the defense focused on the significance of a nearby property at 20 Commerce Street in Wilmington just south of the Christina River off Route 9. Thompson was a truck driver for Leonard's Trucking, and his former supervisor, Daniel Barrick, testified during the 2017 trial that 20 Commerce Street was the location of one of the company's yards.[11] The location would be of future

---

[6] *See* App. to Opening Br. at A188 ("I asked him what's up? What happened? And he's like . . . the information was accurate . . . but he seen [sic] them too late because I guess . . . where he was at there was a tree, so he seen him too late to go run down on him. So he was going to do it when they come back in . . . . He was going to do it. Later on.").

[7] App. to Answering Br. at B246–47 ("By 11:38 [they] get the word [the Connells] are leaving in about an hour. They still have time to drive to the Paladin Club. And where does the Kenny phone hit at 11:45? In the vicinity of the Paladin Club.").

[8] *Id.* at B248.

[9] *Id.* at B248–50.

[10] *Thompson*, 2022 WL 1744242, at 3.

[11] App. to Answering Br. at B225.

significance as Barrick provided Leonard's Trucking locations in 2017, rather than at the time of the murders in 2013.[12] It was later revealed that Leonard's Trucking did not occupy the 20 Commerce Street location until 2014.[13] Nevertheless, during trial, the State and the defense used this mistaken information to their benefit.

The State zeroed in on 20 Commerce Street as the possible location near the Christina River where Thompson traveled to and from the crime scene.[14] It fell within the area along the Christina River highlighted by CSLI evidence.[15] Using this specific address, the State was able to show that Thompson was only about a seven-minute drive away from the crime scene.[16] That 20 Commerce Street was a Leonard's Trucking location also meant that Thompson could lie in wait there without drawing attention.[17]

The defense meanwhile sought to use the 20 Commerce Street location within the CSLI-identified area to show that Thompson was at work instead of participating

---

[12] *Thompson*, 2022 WL 1744242, at *4 ("[T]he State asked Thompson's supervisor for Leonard's Trucking's address. The State did not specify a timeframe. The supervisor answered, in the present tense, that one of Leonard's addresses is located on 20 Commerce Street.") (internal citations omitted).

[13] *See* App. to Opening Br. at A369.

[14] *See id.* at A335, A357–64.

[15] *See* App. to Answering Br. at B199–200.

[16] *See* App to Opening Br. at A335 ("Q: How long does it take to get from the Paladin Club to Leonard's Trucking? A: About seven minutes.").

[17] *See id.* at A357 ("The State would argue [20 Commerce Street] was a good place to wait; A good place where he wouldn't be noticed hanging around waiting, maybe for some further instructions.").

in a murder.[18]  Barrick testified that he was working remotely on Saturday, September 21, 2013, the day before the murders, so he had not seen Thompson but knew he was at work that morning.[19]  It was possible, according to Barrick, that Thompson had taken on additional routes later that day and evening.  Placing him at 20 Commerce Street provided the defense with a plausible alternative explanation for his presence in the area.[20]  As the Superior Court explained, this furthered the attempt to "portray[] Thompson as a hard worker who walked the straight-and-narrow path and did not need extra money from a murder-for-hire scheme."[21]

And third, the State called Carl Rone as a ballistics expert.  At the time, Rone was a Delaware State Police employee.[22]  The police did not recover the murder weapon, so Rone's testimony and peer-reviewed expert reports focused on examination of the shell casings found at the murder scene.[23]  He "testified that some of the bullets were fired from the same gun.  But he was unable to opine on whether the remaining bullets were fired from one gun or multiple guns."[24]  Rone's testimony did not speak to the identity of a possible shooter.  The Superior Court described

---

[18] *See* App. to Answering Br. at B342 ("[F]rom a strategic point of view, it was the defense's position to attempt to put Mr. Thompson at work on the evening in question . . . .") (Maurer Aff.).
[19] *Id.* at B225.
[20] *See id.* at B239–40.
[21] *Thompson*, 2022 WL 1744242, at *19.
[22] App. to Opening Br. at A100.
[23] *Thompson*, 2022 WL 1744242, at *2.
[24] *Id.*

Rone as having "played a very minor role in the trial" and assessed Rone's testimony as doing little more than "curtailing the so-called 'CSI effect.'"[25]

After the October 2017 trial, the jury convicted Thompson of all charges. The trial judge sentenced him to two terms of life imprisonment plus 45 years. With the assistance of trial counsel, he filed a direct appeal in April 2018. We affirmed his convictions in February 2019.

C.

Two events came to light during and after Thompson's direct appeal. First, the State indicted Carl Rone in May 2018 for falsifying State Police time sheets in 2016 and 2017. After filing Thompson's opening brief on direct appeal, Thompson's counsel agreed to defend Rone against the charges brought by the State. Rone eventually pled guilty to misdemeanor theft charges. Also, after a private investigator interviewed Barrick as part of the postconviction relief investigation, they discovered that Leonard's Express did not occupy 20 Commerce Street at the time of the murders in 2013.[26]

In his Superior Court postconviction relief motion, Thompson claimed that his counsel was ineffective for three reasons: (1) failing to investigate whether the

---

[25] *Id.* at *2, *10.
[26] App. to Opening Br. at A369 ("Barrick agreed to speak and after reviewing the company's lease was able to confirm Leonard's Express occupied the property at 20 Commerce Street on 01/29/14.").

trucking company occupied 20 Commerce Street at the time of the murders and failing to object to the State's use of that property at trial; (2) counsel's concurrent representation of Rone while Thompson's case was on appeal, which allegedly created an actual and prejudicial conflict of interest; and (3) counsel's failure to make a meaningful challenge to payment records used to link Thompson with the Kenny AAAA phone.

The Superior Court denied Thompson's motion. The court found that the 20 Commerce Street claim failed for lack of prejudice given the alternative evidence, such as CSLI, that established Thompson's guilt. It also ruled that the payment records claim failed to show deficient performance by counsel and prejudice. As the court held, counsel attempted to exclude the evidence at trial, and, in any case, there was additional evidence of Thompson's guilt and his connection to the Kenny AAAA phone.[27] For the claims involving Rone, the analysis was different.[28] The court found that Thompson failed to show either an actual conflict or prejudice.[29]

---

[27] The court, for example, relied on Bey's testimony and CSLI evidence as sufficient grounds for establishing Thompson's guilt and pointed to the call with Thompson's girlfriend on the Kenny AAAA phone as grounds for connecting him to that phone. *Thompson*, 2022 WL 1744242, at *18.

[28] *Compare Strickland v. Washington*, 466 U.S. 668, 687 (1984) ("A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction . . . has two components. First, the defendant must show that counsel's performance was deficient. . . . Second, the defendant must show that the deficient performance prejudiced the defense.") *with Cuyler v. Sullivan*, 446 U.S. 335, 349–50 (1980) ("[A] defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief.").

[29] *See Thompson*, 2022 WL 1744242, at *15 ("Thompson was required to show an actual conflict. He did not. Without an actual conflict, Thompson must show prejudice. He cannot.") (internal citations omitted).

According to the court, there was no actual conflict as Rone and Thompson did not have materially diverging interests that would have adversely impacted counsel's representation of Thompson on appeal. And the court found that Rone's testimony played a very minor role in securing Thompson's conviction.[30]

Thompson has appealed the Superior Court's rulings regarding the 20 Commerce Street property and the conflicted representation claim.

## II.

"We review the Superior Court's denial of postconviction relief for abuse of discretion."[31] "We review legal or constitutional questions, including ineffective-assistance-of-counsel claims, de novo."[32]

## A.

In *Wheeler v. State*, we recently summarized the elements of an ineffective assistance of counsel claim:

> [A defendant] must show "first, that . . . counsel's representation fell below an objective standard of reasonableness, and second, that the deficiencies in counsel's representation caused him substantial prejudice." These are the frequently cited "well-worn standards" applicable to ineffective-assistance-of-counsel claims announced by the United States Supreme Court nearly four decades ago in *Strickland v. Washington*. We may uphold the denial of an ineffective-assistance

---

[30] *Id.* at \*16 ("The State proved Thompson's guilt without Rone and so new evidence that may have generally impeached his character would not have resulted in a new trial or conviction reversal. Accordingly, the Conflict Claims fail for lack of prejudice.").
[31] *Cabrera v. State*, 173 A.3d 1012, 1018 (Del. 2017).
[32] *Green v. State*, 238 A.3d 160, 173 (Del. 2020).

claim without addressing the reasonableness of trial counsel's performance if prejudice is lacking.[33]

First, Thompson argues that counsel was ineffective for failing to investigate who leased the 20 Commerce Street property at the time of the murders and for failing to object to the State's use of that address as a staging point for the murders. We are unpersuaded for several reasons. As an initial matter, it is reasonable to assume that Thompson knew that the 20 Commerce Street property was not a Leonard's Trucking location at the time his counsel suggested he worked there. After all, he worked for the company at the time. He could have easily informed his trial counsel of the mistake. That he stayed silent supports a second and equally important point – an investigation by counsel into the 2013 lessee of 20 Commerce Street and lodging an objection to the State's arguments would have undermined Thompson's defense.

At trial, defense counsel's strategy was "to attempt to put Mr. Thompson at work on the evening in question apart from the location of the homicide scene."[34] CSLI evidence placed Thompson in an area south of the Christiana River that included 20 Commerce Street. Thompson's counsel was able to attempt to explain Thompson's presence in the area near the crime scene by pointing to 20 Commerce

---

[33] *Wheeler v. State*, 2023 WL 2886392, at *7 (Del. Apr. 11, 2023) (first quoting *Green*, 238 A.3d at 174 then citing *Strickland*, 466 U.S. at 697–98).

[34] App. to Answering Br. at B342. It was defense counsel that raised whether the Leonard's Trucking yard at 20 Commerce Street fell into the relevant CSLI zone. *See id.* at B199–200.

11

Street, then believed to be a Leonard's Trucking yard. His counsel used the 20 Commerce Street location to Thompson's advantage at trial. Thus, Thompson has not overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."[35]

## B.

Under *Strickland v. Washington*, an attorney laboring under a conflict of interest presents "one type of actual ineffectiveness claim."[36] In *Cuyler v. Sullivan*, the United States Supreme Court held that, before declaring an allegedly conflicted counsel ineffective under *Strickland*, the defendant must show there was an actual conflict of interest, and the conflict adversely affected counsel's performance.[37] In other words, an actual conflict of interest must exist "with respect to a material factual or legal issue or to a course of action,"[38] and the conflict must have "adversely affected his lawyer's performance."[39] If the defendant demonstrates an actual conflict of interest that materially affected his performance, there is a presumption that the defendant suffered prejudice by the conflicted representation.[40]

---

[35] *Strickland*, 466 U.S. at 689.

[36] *Id.* at 692.

[37] *See Sullivan*, 446 U.S. at 348–50; *see also Purnell v. State*, 254 A.3d 1053, 1105 (Del. 2021) ("An 'actual conflict' exists when a movant can show that counsel actually had divided loyalties that affected his or her performance.").

[38] *Lewis v. State*, 757 A.2d 709, 718 (Del. 2000) (quoting *Sullivan*, 446 U.S. at 356 n.3 (Marshall, J. concurring in part and dissenting in part)).

[39] *Sullivan*, 446 U.S. at 348.

[40] *See id.* at 349–50.

Thompson claims that counsel's simultaneous representation of Rone had an adverse impact on his defense. As he argues, the conflict precluded counsel from pursuing a thorough investigation into Rone that would have thrown his testimony into doubt. According to Thompson, following Rone's arrest,

> trial and appellate counsel had a duty to conduct additional investigation to determine the relationship between Rone's acts of thievery and deceit, and the testimony and examination and testing of evidence admitted at Appellant Thompson's trial. Such investigation could have developed further evidence of misconduct by Rone, and led to additional criminal sanctions against him. That is what Appellant Thompson needed of his counsel after Rone's arrest in early May, 2018. Counsel's conflicting duty of loyalty to his new client, however, prevented him from taking this course of action.[41]

While Rone's criminal charges and misdemeanor conviction are regrettable, Thompson has not shown how Rone's testimony was material to any of Thompson's defenses. At trial, the State relied heavily on Bey's testimony and corroborating evidence, not on Rone's testimony about weapons or ammunition. Also, the new evidence of time sheet falsification would only impeach Rone's general credibility, and not his specific peer-reviewed report and testimony about the shell casings.[42]

---

[41] Opening Br. at 34. The order of events is notable here as Rone was indicted after counsel filed the Opening Brief in Thompson's direct appeal, meaning there was no conflict or information that counsel would have been aware of at that stage of the proceedings.

[42] *See Purnell*, 254 A.3d at 1098–99 ("Generally, to be more than 'merely' impeaching or cumulative, new evidence attacking the weight or credibility of a witness's trial evidence attacks the credibility of the witness in the case at bar specifically, rather than impeaching the witness's credibility in general."); *see also State v. Pierce*, 2018 WL 4771787, at *5 (Del. Super. Ct. Oct. 1, 2018) (finding that independent corroboration of Rone's role in the chain of custody decreased the significance of Rone's credibility).

Thus, counsel did not face a decision where his representation of one client required disadvantaging the other. As the Superior Court explained, "Trial Counsel left Rone out of Thompson's appeal because Rone was of no use to Thompson on appeal, not because of some conflicting interest with Rone."[43]

This is not the first case dealing with the fallout from Rone's arrest and conviction. A number of defendants have tried to use Rone's falsification of time sheets to upset convictions.[44] But "every court" to consider the issue has concluded that "evidence that tends to impeach Rone's character is not a ground for invalidating a conviction unless Rone was 'vital' to proving the defendant's guilt."[45] General character impeachment of Rone in this case was neither vital to Thompson's conviction nor does it suggest that Rone crossed the line from falsifying time sheets to providing a compromised expert report and testimony.

Thompson claims that "Rone's work, handling of evidence, and testimony, were essential components of the State's case."[46] According to Thompson, "the

---

[43] *Thompson*, 2022 WL 1744242, at *10.

[44] *See id.* at *12 n.115 (listing cases where Rone acted as a witness for the State).

[45] *Id.* at *12; *see, e.g.*, *Fowler v. State*, 194 A.3d 16, 27 (Del. 2018) (remanding for new trial because the State had no other reliable evidence other than Rone's testimony and Rone's reliability was critical to observations he had made due to specific subjective methodology used); *Dixon v. State*, 258 A.3d 146 (Del. 2021) ("Dixon has not shown how Rone's criminal convictions undermined the credibility of Rone's testimony in this case."); *Sierra v. State*, 242 A.3d 563, 571 (Del. 2020) ("Rone's testimony was not so critical in this case . . . ."); *State v. Romeo*, 2019 WL 918578, at *29 (Del. Super. Ct. Feb. 21, 2019), aff'd, 219 A.3d 995 (Del. 2019) ("Romeo has failed to articulate how the issue of Rone's credibility has created a significant change in the factual circumstances of his case. Romeo's argument overlooks the fact that Rone's testimony was not at all vital to Romeo's conviction.").

[46] Opening Br. at 36.

14

State's presentation would have been incomplete without Rone's testimony" as it "tended to show that the decedents were killed intentionally, most likely by two firearms and second, that the State conducted a thorough professional investigation."[47]

The argument, however, lacks support in the record and, in any case, exaggerates Rone's role in the trial. It was undisputed that the murders were intentional and that the perpetrators used a firearm as the murder weapon. Without the actual weapon, Rone could not provide any further opinion. And testimony from other individuals tended to show a thorough investigation by the State. Beyond Rone, the trial included testimony from a New Castle County detective about ballistics evidence, a medical examiner regarding post-mortem autopsies, and an FBI special agent regarding CSLI evidence.[48]

Finally, Thompson attempts to characterize counsel's concurrent representation as a "positional" conflict of interest. A positional conflict "arises

---

[47] *Id.* at 43–44.

[48] App. to Answering Br. at B1–76; B77–119; B148. Thompson also argues that the Delaware Lawyers' Rules of Professional Conduct and the ABA Standards for the Defense Function should frame the conflict issue. Under *Strickland*, however, our review is constitutional under the Sixth Amendment, not by applying ethical standards. *See* 466 U.S. at 687. For example, under the ethical rules, a "significant risk of a conflict might raise ethical issues," DEL. LAWYERS' R. PROF'L CONDUCT 1.7, but the United States Supreme Court has required an actual conflict to support an ineffective assistance of counsel claim. *See Sullivan*, 446 U.S. at 350 ("We hold that the possibility of conflict is insufficient to impugn a criminal conviction. In order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance.").

15

when two or more clients have opposing interests in unrelated matters" that would require a lawyer to "argue both sides of the same legal question."[49] Thompson contends that counsel's representation of Rone precluded him from taking various courses of action that would have favored him but would have also disadvantaged Rone by further exposing his dishonesty. Thompson believes, for example, that an unconflicted counsel would have looked deeper into Rone's misconduct to determine "whether Rone's work product was also infected by dishonesty" in the hopes of undermining the reliability of the ballistics report used in the Connell homicide investigation.[50]

While such an investigation, if fruitful, would have been damaging to Rone, it would not present a positional conflict that would have required counsel to take conflicting positions on "the same legal question." As the Superior Court helpfully summarized, "[i]f Trial Counsel were successful for Thompson, that would not mean Rone falsified his time sheets. If Trial Counsel were successful for Rone, that would not mean Thompson murdered the Connells."[51] Rather, Thompson merely

---

[49] *See Williams v. State*, 805 A.2d 880, 881 (Del. 2002). In *Williams*, a defense attorney faced a situation where in one case he had to argue that the Superior Court should not have given great weight to a jury's 10-2 recommendation in favor of the death penalty for his client. Meanwhile, in another case, he had to argue that a jury's 2-10 vote rejecting the death penalty for his client should have been given great weight by the Superior Court. *Id.*

[50] Reply Br. at 9.

[51] *Thompson*, 2022 WL 1744242, at *14.

repackages his prior arguments that sought to show the presence of an actual conflict of interest.

III.

We affirm the Superior Court's judgment.